**NXIVM CORPORATION, Executive Success Programs, Inc., Alex Betancourt, Barbara Bouchey, Clare W. Bronfman, Edgar Boone, Ellen Gibson, Sara R. Bronfman, Pamela Cafritz, Suzanne Kemp, Wayne Bates, Luis Montes, and Franca Dicreensenzo, Plaintiffs,**

v.

**Joseph J. O'HARA, Douglas Rutnik,[1] and Denise F. Polit, Defendants.**

No. CIV. 1:05–CV–1546.

United States District Court, N.D. New York.

Feb. 9, 2007.

---

1. On July 17, 2006, the parties filed a Stipulation of Dismissal with Prejudice in reference to Defendant Douglas Rutnik. Dkt. No. 45. On July 18, 2006, the Honorable Gary L. Sharpe, United States District Judge, endorsed this Stipulation of Dismissal. Dkt. No. 46.

Proskauer Rose LLP (Douglas C. Rennie, Esq., Peter J.W. Sherwin, Esq., Scott A. Eggers, Esq., of counsel), New York, NY, for Plaintiffs.

Dreyer Boyajian LLP (William J. Dreyer, Esq., James R. Peluso, Jr., Esq., of counsel), Albany, NY, for Defendants O'Hara and Polit.

Lowenstein Sandler PC (Peter L. Skolnik, Esq., Of Counsel), Roseland, NJ, for Intervenor Rick Ross.

## MEMORANDUM DECISION and ORDER

TREECE, United States Magistrate Judge.

## Table of Contents

I. BACKGROUND ........................................... 114–122
 A. Relationship Between NXIVM and Joseph O'Hara .................... 114–117
 B. NXIVM and Rick Ross ............................................ 117–119
 C. NXIVM and O'Hara ............................................... 119–120
 D. Sitrick Company ................................................. 120–121
 E. *NXIVM v. Sutton, et al.*, Civl Case No. 06–CV–1051, District of
 New Jersey ...................................................... 121–122

II. ISSUES ................................................................ 122
 A. NXIVM .......................................................... 122
 B. O'Hara ......................................................... 122
 C. Intervenor Ross ................................................. 122

III. DISCUSSION ........................................................ 122–145
 A. Intervenor's Motion for this Court to Stay ad Defer to the District
 of New Jersey ................................................... 122–123
 B. Previous Court Order ........................................... 123–124
 C. Attorney–Client Privilege and Work Product Doctrine ............... 124–132
 1. Attorney–Client Privilege .................................... 124–126
 2. Work Product Doctrine ....................................... 126–128
 3. Analysis of the NXIVM/O'Hara Relationship .................... 128–132
 D. Crime/Fraud Exception to the Attorney–Client Privilege and Work
 Product ........................................................ 132–137
 1. Interfor Report .............................................. 133–134
 2. Sting Operation .............................................. 134–137
 E. Waiver of Attorney–Client Privilege and Work Product Doctrine ......... 137–143
 1. Third Party Waiver ........................................... 138–139
 2. Analysis of Raniere .......................................... 139
 3. Analysis of Sitrick Company .................................. 139–143
 F. Discovery for the Purpose of Supporting Ross' Counterclaims
 in the New Jersey Action ........................................ 143–144
 G. NXIVM's Motion to Compel ...................................... 144–145

IV. CONCLUSION ........................................................ 145–146

It is a rare occasion indeed when a non-dispositive motion unravels a tale as eccentric as this. The axiom that facts are sometimes stranger than fiction has never been more applicable. As in most stories, the Motion and Opposition that now confronts this Court has a prologue. As early as March 26, 2006, Plaintiffs (hereinafter collectively referred to as "NXIVM"[2]) informally requested a protective order against Defendant O'Hara.[3] Dkt. No. 36. Pursuant to this Court's directions, the parties entered into negotiations, which extended over several months, to resolve those underlying issues. All seemed resolved when the parties filed a confidentiality stipulation, which was subscribed to by this Court. Dkt. Nos. 47 & 48. However, some unexpected and highly public events occurred during the summer of 2006, which altered the consonant complexion of the litigation, and, NXIVM, once again, sought permission to file a motion for a protective order. Dkt. No. 49, Pls.' Lt.-Mot., dated Sept. 27, 2006; *see also* Dkt. No. 50, Defs.' Lt.-Br., dated Sept. 28, 2006. NXIVM's application for a protective order spawned a request from Rick Ross, a defendant in a related case, to intervene. *See* Dkt. Nos. 53, Peter Skolnik, Esq., Lt.-Br., dated Oct. 5, 2006 & 51, Mem. of Law (filed under seal). In July 2006, Ross served a subpoena upon Defendant O'Hara on matters having a nexus to those unexpected events alluded to above. If granted, NXIVM's application for a protective order would have profound effect upon Ross' subpoena. After conferring with the parties, this Court granted NXIVM permission to file a Motion for a Protective Order and Ross the right to intervene in NXIVM's request.

On October 20, 2006, NXIVM filed a Motion (1) for a Protective Order prohibiting Defendant O'Hara from disclosing privileged and confidential information to third parties, (2) to quash the third-party (Ross) subpoena served upon O'Hara, and (3) to compel the return of client files and related discovery. Dkt. No. 57, Not. of Mot., Nancy Salzman Decl., dated Oct. 19, 2006, Exs. A–AT. O'Hara filed an Opposition to the Motion. Dkt. Nos. 58, Defs.' Lt., dated Nov. 20, 2006 (seeking that their pleading be filed under seal,[4] which was granted) & 68, Defs.' Mem. of Law, James Peluso, Esq., Aff., dated Nov. 20, 2006, with Exs. A–H, Joseph J. O'Hara Aff., dated Nov. 20, 2006, with Exs. A–Y. As permitted, Intervenor Ross filed a Memorandum of Law and Declarations from Peter L. Skolnik, Esq., dated Oct. 1, 2006, with Exs. A–G, and Rick Ross, dated Oct. 1, 2006, with Exs. A–D, all filed under seal. Dkt. No. 67. NXIVM filed a Reply to both O'Hara's and Ross' Opposition to its Omnibus Motion. Dkt. Nos. 61, Nancy Salzman Decl., dated Dec. 1, 2006, Douglas Rennie, Esq., Decl., dated Dec. 1, 2006, with Exs. A–J, & 63, Pls.' Reply Mem. of Law.

After all of the pleadings and papers were filed, O'Hara sought permission to submit yet another exhibit and an explanation as to its relevance to the Motion. Dkt. No. 64, Lt.-Mot., dated Dec. 4, 2006. The Court granted O'Hara permission to file a Letter–Brief with Exhibits. Dkt. Nos. 65, Defs.' Supp. Lt.-Br., dated Dec. 7, 2006, with Exs., & 68, Sealing Order, dated Dec. 7, 2006. Likewise, NXIVM was granted permission to file under seal a Reply to O'Hara's Supplemental Letter–Brief. Dkt. No. 69, Pls.' Supp. Reply Lt.-Br., dated Dec. 7, 2006. Nonetheless, this matter was not fully briefed, so each party was granted permission to file a very brief Memorandum of Law and more Exhib-

---

2. NXIVM Corporation is the successor to Executive Success Program, which is referred to in the parties' papers as ESP. Further, notwithstanding we have twelve Plaintiffs, it appears that NXIVM is the heart and soul of Plaintiffs' case against the Defendants. Therefore, for the sake for brevity, since all of the Plaintiffs appear to be united in interest, we will refer to the Plaintiffs collectively as NXIVM.

3. As mentioned in note 1, Defendant Rutnik has been dismissed from this case. The only remaining Defendants are O'Hara and his former wife Denise F. Polit. The crux of NXIVM's complaints are directed exclusively toward O'Hara. For the sake of clarity in addressing this Motion, Defendants will be referred to collectively as "O'Hara."

4. Because this Motion pertains to matters that may be cloaked by the attorney-client privilege, the work product doctrine, or possibly provide the basis for other confidentiality claims, all of the papers, except the initial Motion, have been filed under seal.

its. Dkt. No. 71, Pls.' Mem. of Law, dated Jan 8, 2007, Kristin Keefe Decl., dated Jan 8, 2007, with Exs. A & B; Dkt. No. 72, Defs.' Lt.-Mem. of Law, dated Jan. 8, 2007, Joseph J. O'Hara Decl., dated Jan. 8, 2007, with Exs. A–D.

## I. BACKGROUND

This is a rather prodigious, fact intensive litigation. More precisely, the litigation is actually plural. In addition to this litigation, there is related litigation in the District of New Jersey. The facts in these cases could not be any more convoluted and are rendered more complicated by the tri-party litigious bloodletting that obfuscates any transparency or lucidity. Weighing the vitriolic verbiage dispensed from geometric angles of this issue, it is a wonder if any court could pierce the "perceptual pall" of these legal combatants to discern the true particulars of these Motions and an agreeable set of facts.[5] The divergence of relevant facts are overcast by the matter of credibility. Perspective, credibility and the multifaceted array of arguments and exhibits notwithstanding, after considerable study of the submissions, we submit that we are able to assemble some semblance of the facts. Because there are so many permutations of the facts and issues, we are regrettably obligated to discuss the fractious history of these litigants and their related cases.

### A. Relationship Between NXIVM and Joseph O'Hara

NXIVM Corporation appears to be the successor corporation to Executive Success Program, Inc. ("ESP"). If not the successor, then they are one and the same. The President of NXIVM is Nancy Salzman and other key and relevant officials and personalities, particularly with regards to these Motions, are Kristin Keefe, an employee who may have acted as the "Corporate Legal Liaison,"

and Kenneth Raniere. Dkt. No. 57, Ex. R, Kristin Keefe, Decl., dated Aug. 7, 2006, Ex. AD, Nancy Salzman Decl., dated Sept. 12, 2005, at ¶3; Dkt. No. 68, Ex. O, O'Hara Lt., dated. Nov. 19, 2004 at p. 1; Dkt. No. 71, Kristin Keefe Decl., dated Jan. 8, 2007. Although he has no official title, and has been identified as a "volunteer consultant," the founder or "defacto leader" of NXIVM is Kenneth Raniere. NXIVM provides an exclusive seminar training program primarily for executives, though extended to others as well, known as Executive Success. Executive Success employs a methodology called Rational InquiryTM, which is purported to improve communication skills, memory, and decision-making. NXIVM claims that Rational InquiryTM is proprietary and thus protected.

Joseph O'Hara has worn many professional hats over his thirty-year career. Although he is an attorney admitted to practice law in Washington D.C., but not in the State of New York, for most of his career he has been a business man and a lobbyist. In reference to his many business ventures in New York, he is the President and Chief Executive Officer (CEO) of Strategic Government Solutions, Inc., and The O'Hara Group & Associates, LLC ("TOGA LLC"). As reported on his resume, TOGA LLC is a New York based limited liability company that provides lobbying and marketing services to both private and public sector clients. Dkt. No. 68, Ex. A. Early in his career, O'Hara practiced law in Washington D.C., however, that practice became relatively dormant until July 2004. O'Hara re-established his practice of law as TOGA PLLC that now serves government and municipal agencies, school districts, and clients of Strategic Governmental Solutions, Inc. ("SGSI"). Dkt. No. 68, Ex. G, O'Hara Decl., dated Sept. 8, 2005, at ¶6; O'Hara

---

5. Periodically percolating throughout the pleadings, motion papers and the oppositions thereto, and the corresponding affidavits and exhibits in this and the New Jersey case are *ad hominem* attacks, scurrilous and specious name calling, and provocative charges of ill-motives on the part of all litigants and even the litigators that have not served any party well. Cumulatively, all parties have cluttered the discussion with clever and passionate prattle rather than precise pronouncement of the facts and the issues. The Honorable Mark Falk, United States Magistrate Judge for the District of New Jersey, listed some of the more opprobrious statements that confront both courts. New Jersey Tr., at pp. 30–34. These virulent commentaries have distracted and even sullied what are, generally speaking, well written memoranda.

Decl., dated Nov. 20, 2006, at ¶4, Ex. A (resume).

In September 2003, Dee Dee Mitzen, a representative of NXIVM, contacted O'Hara to assist them because NXIVM's business was affected by negative publicity generated by its litigation against Rick Ross and the Ross Institute. O'Hara avers that he told Mitzen that he did not practice law in New York but was in a position to recommend attorneys. On September 17, 2004, O'Hara met with Mitzen and Nancy Salzman and he reiterated to both that he did not practice law in New York. Nonetheless, after this meeting, on or about September 22, 2003, O'Hara drafted and forwarded a Strategic Plan that would cover various consultation services, including public relations, lobbying, and marketing needs. In fact there were three drafts before the Plan was reduced to its final form. Dkt. No. 68, Ex. F.[6] Within the Strategic Plan and its cover letter, other entities, such as law, lobbying, and public relations firms are mentioned, and O'Hara identifies himself as the Strategic Plan Coordinator. Apparently based upon this proposal, the parties agreed to enter into a Professional Service Agreement on or about September 29, 2003. This Agreement was limited for the term of October 1, 2003 through December 31, 2004, and O'Hara is identified as Consultant throughout. Ostensibly, the parties were operating under this Agreement even though it was not signed by Salzman. Dkt. No. 65, O'Hara's Decl., dated Nov 20, 2006, at ¶¶1–10; *see also* Dkt. No. 61, Nancy Salzman's Reply Decl., dated Dec. 1, 2006, at ¶¶3 & 4.

In terms of the scope of any legal representation, and to understand the issues in this Omnibus Motion, there are two critical passages within the Professional Service Agreement:

The Consultant will provide—and/or help the Company the Company/Executive Success Programs to obtain—appropriate technical assistance and/or consultative services that will help ... to resolve various issues .... In this regard, those issues, include but are not limited to ... the legal status of Company/Executive Success Programs in New York State ... [.]

Dkt. No. 68, Ex. G, at p. 1.

\* \* \* \* \* ^ \*

The Consultant will help to coordinate the work of various attorneys who are currently providing legal services to the Company/Executive Success Programs—and/or help to identify other appropriate attorneys who can provide needed legal services to the company if/as the need arises for same (Note: the Company/Executive Success Programs will enter into separate written agreements with respect to all of the attorneys that it hires to provide legal services on its behalf—and it is mutually understood and agreed that the Consultant will not provide any direct legal services to the Company/Executive Success Programs.)

*Id.* at p. 3.

In the context of this Omnibus Motion, O'Hara contends that the latter paragraph is a disclaimer of any notion that he was providing legal services. Dkt. No. 68, O'Hara Decl., dated Nov. 20, 2006, at ¶1. NXIVM asserts that the former paragraph establishes that indeed O'Hara was providing legal advice to them. *See generally* Dkt. No. 57, Pls.' Mot.

In support of O'Hara's contention that he was not serving as an attorney, he refers to a matter that had significant legal and tax implications for Raniere and Salzman to which he wrote a memorandum, dated May 13, 2004, suggesting "that you hire an attorney who specializes in this area of the law ... and you [should] *not* have any discussions with me and/or Jim Loperfido [NXIVM's accountant] with respect to this

---

6. There was a cover letter addressed to Keith Raniere in which O'Hara wrote,

if you are interested in having me serve as NXIVM's "Strategic Plan Coordinator," I will draft a "Letter-of Agreement" .... I will structure my proposed compensation in a manner which recognizes the fact that the responsibility and time commitment of the "Strategic Plan Coordinator" will be directly tied to the scope-of-work that will be undertaken by the various entities that will be providing services to NXIVM in conjunction with the "Strategic Plan[.]"

Dkt. No. 68, Ex. F.

matter since we would most likely have to disclose such discussions if we were ever subpoenaed with respect to same." *Id.*, Ex. I. On the other hand, Plaintiffs identify other transactions where O'Hara may have acted as an attorney or at least presented himself as a legal representative. *See generally* Dkt. No. 57, Exs. AE–AJ.[7]

In the Spring of 2004, the parties had a discussion that O'Hara should re-establish his law practice in Washington D.C. solely for the purpose of establishing or possibly solidifying an attorney-client relationship and preserving confidentiality in their communications. The parties disagree as to who was the progenitor of this idea, however.[8] As early as July 2004 but confirmed in October 2004, TOGA PLLC was re-constituted. Also at the same time, the law firm of Nolan and Heller was representing NXIVM in the lawsuit against Rick Ross, Ross Institute, and others for copyright and trademark infringement. *See infra* section I.B. It further appears that Richard H. Weiner, Esq., of Nolan and Heller had recommended to NXIVM to hire the international investigative firm of Interfor Inc. ("Interfor") to investigate the demise of Kristen Snyder of Anchorage, Alaska, a former NXIVM student who may have committed suicide. Dkt. No. 68, Ex. M. Initially Interfor forwarded the "Terms of Engagement" to Nolan and Heller, however, on November 9, 2004, Interfor mailed the "Terms of Engagement" to TOGA PPLC, which was signed by O'Hara on November 17, 2004. Dkt. No. 68, Ex. N. Within the Terms of Engagements are two key statements: (1) "Interfor agrees to conduct factual inquires as may be mutually agreed upon and to consult with and assist The O'Hara Group in formulating strategy and preparing for legal proceedings, if applicable;" and (2) "It is further understood and agreed that [certain generated work papers and reports] will be deemed confidential work product prepared in connection with the case[9] and that all communications between The O'Hara Group and Interfor shall be for the purpose of assisting The O'Hara Group and are, therefore, privileged." *Id.* at pp. 1 & 2; *see also* Dkt. No. 68, O'Hara Decl.; *see generally* Dkt. No. 57, Pls.' Mot.

On November 23, 2004, Interfor faxed a confidential status report on Rick Ross to O'Hara. Dkt. No. 68, Ex. P. This Status Report is a thorough expose on Rick Ross and includes some controversial and unflattering information about him. The most controversial information, which is now the focal point of this and the New Jersey lawsuits, is the revelation of discrete banking activity within Ross' and his personal friend's respective checking accounts and Ross' private telephone conversations. *Id.*[10] Upon receiving

---

**7.** Plaintiffs present a number of Declarations stating, in unison, that they considered O'Hara NXIVM's attorney and may have observed him performing legal services. *See* Dkt. No. 57, Nancy Salzman Decl., dated Oct. 19, 2006, with Exs. A–F, Ex. R, Kristin Keefe Decl., dated Aug. 7, 2006, Ex. AD, Nancy Salzman's Aff., dated Sept. 12, 2005, & Exs. AE–AJ, Declarations of Michael Sutton, James Loperfido (accountant), John Casey, Sara Bronfman, and Clare Bronfman; Dkt. No. 63, Ex. C, Juval Aviv Decl., dated Dec. 1, 2006. Several of NXIVM's Exhibits are paychecks made out to O'Hara noting in the memo section, "legal/professional services." *See* Dkt. No. 57, Exs. A–E.

**8.** O'Hara claims that Raniere asked him to re-establish his law practice in Washington, D.C. and to take the New York Bar Exam and become admitted in New York. Dkt. No. 68, O'Hara's Decl., dated Nov. 20, 2006, at ¶¶ 15 & 16. Conversely, Salzman claims that the idea to re-activate the Washington, D.C. law firm was solely O'Hara's. Dkt. No. 57, Ex. AD, Salzman's Decl., at ¶ 7.

**9.** The Terms of Engagement only make reference to Kristen Snyder. Dkt. No. 68, Exs. M & N, at p. 1. Ostensibly, the Terms of Engagement expanded to include an investigation into Rick Ross. *See* Dkt. No. 68, Ex. Q, O'Hara's Mem., dated Nov. 24, 2004, at p. 1 ("I was aware that INTERFOR, Inc. [ ] was going to be undertaking a 'Confidential Investigation' of Mr. Ross[.]"); Dkt No. 62, Ex. C, Juval Aviv Decl., dated Oct. 31, 2006, at ¶ 3.

**10.** In their Reply Papers, Plaintiffs note that most of the facts set forth in this Status Report can be found on the website *www.religious freedomwatch.org*. Dkt. No. 69, Ex. B. While it may be accurate that this website reveals significant sensitive information about Ross, there is no information about his individual banking transactions nor private telephone calls. The issue that we may have to address is whether this investigation breached federal banking laws.

this Status Report on Ross, O'Hara wrote and hand-delivered a memorandum, dated November 24, 2004, to Raniere and Salzman noting, *inter alia*, that:

> In this regard, my initial review of this document indicates that at least some of the information that is contained therein could not have been obtained legally without the approval of a court of competent jurisdiction (e.g., information from Rick Ross' medical records; detailed information concerning recent activity in his checking account; detailed information concerning his recent telephone calls; etc.)... Although I was aware that INTEFOR, Inc. (INTERFOR) was going to be undertaking a "Confidential Investigation" of Mr. Ross—and the activities of The Ross Institute—I was *not* aware that this review would involve any illegal (and potentially criminal activities) (*Note: Since, per your direction, Kristin Keeffe was designated as the sole representative of The O'Hara Group & Associates, PLLC (TOGA) with respect to INTERFOR, I do not have any personal knowledge as to what activities the company has authorized to undertake on behalf o NXIVM Corporation "doing business as" Executive success programs (NXIVM/ESP) and/or either of you* ). In this regard it is imperative that you—or Kristin—immediately direct INTERFOR to cease and desist any such activities... At this point, I am not willing to have INTERFOR continue undertaking activities on behalf of NXIVM/ESP through TOGA unless I have your personal assurance that all of those activities will be completely legal (*Note: This specifically includes, but is not limited to, the "Sting Operation" that Keith has proposed having INTERFOR undertake with respect to Mr. Ross.*)

Dkt. No. 68, Ex. Q at p. 1 (emphasis in original).

O'Hara disclaims that he gave Interfor any directions or guidance on the Ross Status Report. Dkt. 68, O'Hara Decl. at ¶ 24.

O'Hara contends that shortly thereafter, on January 2, 2005, he sent an email to Raniere informing him that their professional relationship was severed for sundry reasons. Dkt. No. 68, O'Hara Decl. at ¶ 29. A written termination of the relationship was forwarded on March 11, 2005. Dkt. No. 68, Ex. T; Dkt. No. 57, Nancy Salzman's Decl., dated Oct. 19, 2005, at ¶ 9, Ex. B. This termination letter acknowledges that TOGA PLLC may have provided legal services, but O'Hara inserts this rather curious paragraph:

> I submit to you, I believe that all of TOGA's work to date is entitled to all of the protections that are associated with "Attorney/Client Privilege". *In this regard, however, please be advised that this privilege only applies to work that was undertaken—and/or related discussions that occurred—during the period from July 1, 2004 [the date TOGA PLLC was re-established] through this date.*

Dkt. No. 68, Ex. T at p. 2 (emphasis in original).

### B. NXIVM and Rick Ross

Rick Ross is generally known as a deprogrammer and operates a website at *www. rickross.com.* A visitor to this website will find information about organizations Ross and others consider to be controversial groups, movements or cults and other related information. Additionally, he is the founder of the Ross Institute where Ross serves as a consultant, lecturer and an intervention specialist. Dkt. No. 67, Rick Ross Decl., dated Oct. 1, 2006, at ¶¶ 2 & 3. NXIVM is one of those groups criticized on the website.

In August 2003, NXIVM filed a lawsuit in this District Court against Ross and the Ross Institute, among others, presumably arising out his relationship and involvement with Stephanie Franco and Morris and Michelle Sutton.[11] Civil Case No. 03–CV–976. The

---

11. Morris and Michelle Sutton and Stephanie Franco are defendants in the *NXIVM v. Ross, et al.,* 03–CV–976. While this case was pending in the Northern District of New York and before it was transferred to the District of New Jersey pursuant to 28 U.S.C. § 1404(a), the Honorable Thomas J. McAvoy, now Senior District Court Judge and the Honorable Gary L. Sharpe, United States District Court Judge, were the presiding judges. Additionally, and highly relevant to the issues before this and the New Jersey case, in October 2003, Forbes Magazine issued an unflattering expose on NXIVM, Raniere, and Salzman,

complaint in this action against Ross alleges that Ms. Franco attended an Executive Success Program and was provided "protected" material of which she signed an agreement not to disclose to the public. Apparently Franco shared this information with Ross who posted the material on his and others' websites and may have shared the hard copies with others, all allegedly violating trademark and copyright laws. *Id.*, Dkt. No. 1, Compl., at ¶¶ 22–41. This case was consolidated with another and transferred to the District of New Jersey. *Id.;* Dkt. No. 222, Summary Order on Mot. to Change Venue, dated Feb. 21, 2006; Dkt. No. 57, Ex. L, Am. Consolidated Compl.[12]

During the pendency of *NXIVM v. Ross et al.*, sometime in November 2004, while all the parties were represented by counsel, Ross was contacted by Interfor's President, Juval Aviv, and a meeting was set up. Ross was unaware that Interfor was working for NXIVM. Later that month Ross met with Aviv, Anna Moody, Aviv's assistant, and a "concerned and distraught" mother by the name of Susan L. Zuckerman, who represented to Ross that she had a daughter by the name of Judy who was involved with NXIVM. Approximately five months later, on or about April 7, 2005, Moody contacted Ross to set up another meeting, and they met on April 20, 2005. The November meeting with Aviv, Moody, and Zuckerman occurred in Interfor's office supposedly for the purpose of interviewing Ross under the guise that he may be retained to assist Zuckerman and her daughter. Ross avers that during this meeting he was interviewed extensively about his knowledge of NXIVM. Consequently, a plan was concocted to have Ross intervene with Zuckerman's daughter on a

cruise ship outside NXIVM's orbit. Shortly after this meeting, Zuckerman, through her agent Interfor, entered into an agreement with Ross and gave him a $2,500 retainer. Dkt. No. 67, Ross Decl., dated Oct. 1, 2006, Ex. C (Retainer Agreement). Eventually after the April meeting, the plan was called off, Ross was advised that the intervention would not go forward, and that his services were no longer necessary. Dkt. No. 67, Ross Decl., at ¶¶ 3–9.

As we now know, Susan Zuckerman was an actress hired for these meetings and her purported daughter was going to be portrayed by Kristin Keefe, who hoped to "convert" Ross. The nature of that conversion has not been specified in this record. Dkt. No. 67, Ex. B, Ross Decl., at ¶ 10; Dkt. No. 68, O'Hara, Ex. R, Pls.' Ex. R. Now, in retrospect, Ross accuses Aviv, Moody, and Zuckerman, of questioning him about his knowledge of NXIVM and his pending lawsuit outside the presence of his attorney. *See generally* Dkt. 67, Ross Mem. of Law.[13]

On or about July 4, 2006, Chet Hardin, a reporter for the Albany based weekly newspaper, *Metroland,* contacted Ross to discuss the story about NXIVM's efforts to investigate him and to lure him onto a cruise ship. Seemingly, Hardin had a copy of the Interfor Report on Ross, which was provided to him by O'Hara. It appears that O'Hara was also the source of the news story. Dkt. No. 68, O'Hara Ex. V. During Hardin's and Ross' conversation, Hardin read excerpts of the Interfor Report, particularly passages that unveiled the investigation into Ross' banking transactions. On or about August 10, 2006, this story was published in *Metroland.*[14] Dkt. No. 67, Ross Decl., at ¶ 10, Ex. D; Dkt.

and discussed this lawsuit. Dkt. No. 68, O'Hara Ex. F.

12. Now, the matter is referred to as *NXIVM Corp. v. Sutton, et al.*, 06–CV–1051, and the Honorable Mark Falk, United States Magistrate Judge is the assigned judge.

13. Ross recalls being asked a series of questions that include but are not limited to:
 (a) Everything I knew about NXIVM;
 (b) What was my experience with the organization
 (c) Why I considered NXIVM destructive;

 (d) The number of complaints I had received about NXIVM;
 (e) How does NXIVM brainwash people;
 (f) My work history with NXIVM clients;
 (g) How I would handle Zuckerman's case.
Dkt. No. 67, Ross Decl. at ¶ 10.

14. Other stories were published about NXIVM on or about the same time as the *Metroland* story. Dkt. No. 68, O'Hara, Ex. U (Michael Freedman, *Cult of Personality,* FORBES MAGAZINE, dated July 24, 2006) & W (Dennis Yusko, *"Fears and Tears After NXIVM Class,"* ALBANY TIMES UNION, dated Aug. 6, 2006).

No. 68, Ex. W (the article). Ironically, on or about July 12, 2006, O'Hara called Ross and explained the plot against him, discussed some of the intimate machinations of NXIVM's staff and consultants, revealed personal transactions, and further stated that Ross' meetings with Interfor and others, the "sting operation," occurred after O'Hara's November 24, 2004 Memorandum to Salzman and after he tendered his written resignation on March 11, 2005. Dkt. No. 68, O'Hara Decl., at ¶ 28; Dkt. No. 67, Ross Decl., dated Oct. 1, 2006. After this O'Hara/Ross conversation, O'Hara faxed a copy of the Interfor Report to Ross.[15] Dkt. No. 67, Ross Decl., at ¶¶ 13–16, Ex. B, (another) Ross Decl., dated Oct. 1, 2006 (detailing the O'Hara/Ross conversation). Said revelations by O'Hara probably triggered Ross' Subpoena to compel the deposition testimony of O'Hara and representatives of Interfor. Dkt. No. 57, Rennie Decl., at ¶¶ 16–19, Exs. N–P. Based upon these events, Ross has filed a Motion to Amend his Answer in the New Jersey case to add counterclaims against NXIVM, for these purportedly improper *ex parte* contacts. Dkt. No. 57, Rennie Decl., at ¶ 23.

### C. NXIVM v. O'Hara

On August 18, 2005, Plaintiffs commenced an action against O'Hara and others in this District Court. Civil Case No. 05–CV–1045. Numerous causes of action were alleged by all of the Plaintiffs against O'Hara and others, however, just in terms of NXIVM and O'Hara, it appears that NXIVM alleged causes of action sounding in legal malpractice, racketeering, fraud, breach of fiduciary duty, breach of contract, and unjust enrichment. *Id.*, Dkt. No. 1, Compl. Immediately after filing the Complaint, Plaintiffs sought a temporary restraining order and a preliminary injunction. *Id.*, Dkt. Nos. 7–9. These applications were denied. *Id.*, Oral Order, dated Sept. 12, 2005. Then, creating a novel turn of events, pursuant to FED. R. CIV. P. 41(a)(1), Plaintiffs voluntarily dismissed this action without prejudice. *Id.*, Dkt. No. 27, Stip. and Order, dated Sept. 14, 2005. However, this litigation was far from over.

Before the ink could dry on the Stipulation and Order of Voluntary Discontinuance, and as a glaringly transparent end run around the District Court's ruling on the preliminary injunction, Plaintiffs filed, on September 12, 2005, the very same action in New York Supreme Court, County of New York, alleging virtually verbatim the same causes of actions and seeking the very same relief as sought in the previous District Court case. Civil Case No. 05–CV–1546, Dkt. No. 1, Notice of Removal, with State Compl. The matter was removed to the Southern District of New York posthaste and on December 1, 2005, this case was transferred back to the Northern District of New York. *See* Dkt. No. 26.

O'Hara served his initial mandatory disclosures pursuant to FED. R. CIV. P. 26(a) in February 2006, and included in that packet of documents was the Interfor Report. Dkt. No. 57, Douglas Rennie, Esq., Decl., dated Oct. 20, 2006, at ¶ 3, Exs. A & B. Wasting little time to assert privileges, by a Letter–Motion, NXIVM sought a protective order. Dkt. No. 36. Pending the briefing on NXIVM's request, the Court issued a Text Order establishing a briefing schedule, but more important, ruled "[i]n the interim, Defendant O'Hara shall not publicly disclosed the documents claimed to be privileged until the Court has conferred with the parties and, to the extent necessary, decided the issued." Text Order, dated Mar. 27, 2006. Because of the complexity of the legal issues, the Court issued another Text Order, establishing, *inter alia*, another briefing schedule. Dkt. No. 40, Text Order, dated Apr. 3, 2006. Rather than pursue the Motion, NXIVM asked the Court to adjourn the briefing so that the parties may enter into an agreement on these issues. Dkt. No. 46, Pls.' Lt.-Mot., dated Apr. 21, 2006; Dkt. No. 57, Rennie Decl., at ¶¶ 6–10.

---

15. O'Hara asseverates that he actually mailed the Interfor Report to Ross in August 2005. Dkt. No. 68, O'Hara Decl., at ¶ 28, Ex. S, O'Hara Lt., dated Aug 30, 2005. However, there is no proof that Ross received the Report on or about that time. Ross explains that the July 12, 2006 conversation with O'Hara was the first time that they spoke. Dkt. No. 67, Ross Decl. at ¶ 13. Further, in August 2005, O'Hara reached out to the Suttons seeking their assistance in establishing a defense fund on his behalf. Dkt. No. 57, Rennie Decl., at ¶ 15, Ex. M.

The records indicate that O'Hara submitted a Confidentiality Stipulation to NXIVM on or about April 20, 2006, which would cover several documents including the Interfor Report. Dkt. No. 57, Rennie Decl., at ¶¶ 6–12, Exs. A, B, & G. Rather than sign expeditiously the Confidentiality Stipulation, NXIVM delayed its execution of the Stipulation until July 19, 2006, at which time it was forwarded to this Court to be so ordered. Dkt. No. 47. This Confidentiality Stipulation became an Order on July 20, 2006. Dkt. No. 48. The Confidentiality Stipulation/Order in many respects is a typical confidentiality agreement but there are several salient provisions that need to be mentioned:

> ¶ 8 The parties agree that the materials appearing as exhibits G through U [includes Interfor Report] to Defendant O'Hara Rule 26(a) disclosure will be treated as "Confidential—Attorney Client Privilege" without prejudice to Defendant O'Hara's position that the materials are not privileged.

> ¶ 11 Any party at any time while the action is ongoing may challenge the "Confidential—Attorney Client Privilege" designation of any Discovery Material.

> ¶ 13 The foregoing is without prejudice to the right of any party hereto to apply to the Court for a further protective order relating to any documents and/or information produced in this litigation.

> ¶ 14 The provisions and terms of this Stipulation will not terminate at the conclusion of this action. However, this Stipulation shall only govern disclosure and release of documents occurring or intended to occur after the date of this agreement. Thus, this Stipulation shall not constitute evidence of an alleged prior disclosure of materials claimed to be protected by the attorney-client privilege or work product doctrines. Similarly, to the extent that there have been any such prior disclosures, this Stipulation shall

not constitute evidence or ratification of any such disclosures by the holder of any such privilege.

Dkt. Nos. 47 & 48; Dkt. No. 57, Exs. E & F, (lawyers' emails on the confidentiality stipulation). The parties concur that this Confidentiality Stipulation/Order did not go into effect until July 20, 2006. Dkt. No. 63, Pls.' Reply Mem. of Law at p. 5. These dates and provisions are critical for the very reason that O'Hara did disclose the Interfor Report subsequent to this Court's March 27, 2006 Order. Dkt. No. 36.

Equally critical dates are the dates when *Metroland* reporter Chet Hardin contacted Ross on or before July 12, 2006, about the contents of the Interfor Report, in which O'Hara is the likely source of the eventual story, and, July 13, 2006, when O'Hara spoke with Ross and then faxed him a copy of the Interfor Report. *See supra* Section I.B.[16]

### D. Sitrick Company

Sitrick Company is a strategic communications firm based in Los Angles, which provides, *inter alia*, litigation supported public relation services. Dkt. No. 71, Kristin Keefe Decl., dated Jan. 8, 2007. at ¶ 1.[17] Interfor introduced Sitrick to NXIVM and the public relations firm began working with NXIVM in October 2004, when an appeal was pending with the Second Circuit Court of Appeals in the matter of *NXIVM v. Ross et. al.*, which appeal ultimately ended in the United States Supreme Court. Dkt. No. 71, Keefe Decl., at ¶¶ 3 & 4. Because of unfavorable publicity, such as a scathing article in *Forbes Magazine*, Sitrick was "retained primarily to assist NXIVM in combating negative press and publicity resulting from *NXIVM v. Ross*." *Id.* at ¶ 3; *see* Dkt. No. 72, Ex. A, Keefe Email, dated Nov. 5, 2004. Keefe was the primary liaison between NXIVM and Sitrick and, to some degree, O'Hara and Salzman had some limited involvement with them. *Id.* at ¶ 5.

16. Furthermore, O'Hara communicated with Morris Sutton about the *Ross* lawsuits. Contents of that contact have not been fully disclosed. There is an intimation that O'Hara may have disclosed the Interfor Report and other information about NXIVM to Sutton. Dkt. No. 57, Douglas Rennie Decl., dated Oct. 20, 2006, at ¶ 15, Ex. M. NXIVM also suspects that O'Hara is the

source for another *Forbes Magazine* article, dated July 24, 2006, and the *Albany Times Union* article about them. Dkt. No. 57, Rennie Decl., at ¶ 26, Exs. U–Y.

17. *See also www.sitrick.com.*

After providing services to NXIVM for approximately three months, on or about December 13 2004, NXIVM, through TOGA PLLC, and Sitrick entered into a written retainer agreement, "effective as of October 20, 2004." Dkt. No. 72, Joseph O'Hara Decl., dated Jan. 8, 2007, at ¶ 5, Ex. B, Retainer Agreement, at ¶ 1. The records indicate that prior to December 13, 2004, Sitrick conferred with NXIVM many times about many matters but only with Nolan and Heller and O'Hara on November 3, 2004. Dkt. No. 72, Ex. C, Sitrick Detailed Billing Records.[18] At such meeting, it appears that the parties discussed the *Ross* litigation. *Id.* On or about November 24, 2004, presumably Interfor provided Sitrick with a copy of the Ross Report. *Id.* at p. 8. O'Hara was not aware of such interchange until he had received and observed on Sitrick's December 10, 2004 Remittance a notation for November 24, 2004, indicating a receipt and a review of the Interfor Report. Dkt. No. 67, O'Hara Decl., at ¶ 5.

Apparently, NXIVM was anxious to have the retainer agreement signed because they believed they "need[ed][it] ASAP for [the] attorney client privileges it afford us." Dkt. No. 72, Ex. A, Keefe's Email, dated Nov. 5, 2004. Sitrick was retained to act as "corporate communication advisor, specialist, and non-designated consultant" to "provide advice and public relations services in connection with various legal issues concerning [NXIVM]," and several of the provisions of the Sitrick retainer agreement were consistent with the belief that attorney client privilege protection would be available: "All communications, correspondence, instruments and writings between Sitrick and Attorney shall be deemed to constitute attorney work-product and otherwise protected by the at-

torney-client privilege." Dkt. No. 72, Ex. B, at p. 2; Dkt. No. 71, Keefe Decl. at ¶¶ 7–10, Ex. A. However, Sitrick was involved in many services on NXIVM's behalf such as "composing press kits, monitoring news coverage, drafting and pitching news stories about Ross, among other things." Dkt. No. 72, O'Hara Decl., at ¶ 6, n. 1, Ex. C, Sitrick's Bill. Sitrick also reviewed legal pleadings, transcripts, legal opinions and other legal documents, participated in strategy meetings on the appeal to the United States Supreme Court, and contacted members of the media about the pending appeal. Dkt. No. 71, Keefe Decl., at ¶ 12 & 13.[19] O'Hara disclaims any active involvement with Sitrick except receiving Sitrick's billings which he faxed to NXIVM. Dkt. No. 72, O'Hara Decl., at ¶¶ 6–8. O'Hara swears that he "never used any information from Sitrick to provide legal advice or services to NXIVM ... [n]or did [he] ever use any information from Sitrick as part of any work performed on behalf of NXIVM." Dkt No. 72, O'Hara Decl., at ¶¶ 17 & 18.

### E. NXIVM v. Sutton, et al., Civil Case No. 06–CV–1051, District of New Jersey

In the New Jersey litigation, NXIVM moved to quash Defendants' subpoena on Interfor, for a protective order preventing the discovery of information related to Interfor, a sealing order of the entire records, and the disclosure of all information and documents received from O'Hara. Dkt. No. 57, Pls.' Mem. of Law, dated Aug. 7, 2006; Dkt. No. 67 Intervenor's Mem. of Law, dated Nov. 17, 2006. Heard concurrently was Ross' Motion to Amend his Answer in order to assert counterclaims. Oral arguments were heard

18. Kristin Keefe avers that Sitrick had many strategic meetings that include telephone calls with NXIVM, Nolan and Heller, and TOGA PLLC staff about the *Ross* litigation. Dkt. No. 71, Keefe Decl., at ¶ 11. However, Sitrick's uncanningly detailed bills do not reflect that at all. Yes, there are many meetings listed with her and Salzman, and other unknown persons, but there is only one meeting in which Nolan and Heller and O'Hara are noted as being present. Dkt. No. 72, Ex. C. Of course, O'Hara denies having such intimate and frequent involvement with Sitrick. Dkt. No. 72, O'Hara Decl., at ¶¶ 6–8.

19. In an email, Keefe outlines the "overall" and "short term" role of Sitrick: "(1) Develop long term and short term PR strategy and implement"; (2) create positive press to support our Supreme Court Cert petition; (3) help figure out and implement strategy for Fritjof; (4) find friendly report to attend Scientist Training; and (5) create positive press for upcoming events. Dkt No. 73, Ex. A, Email.

on January 9, 2007, and the New Jersey Court issued an Order, dated January 10, 2007.

## II. ISSUES

Both the parties and the Intervenor present an ambitious smattering of issues. We would be best served to list them now:

### A. NXIVM

● A protective order should be granted prohibiting O'Hara from further disclosure of Plaintiffs' Protected Information and there is good cause for such protective order;

● O'Hara's conduct constituted the practice of law and he owed ethical duties to Plaintiffs;

● O'Hara's disclosure violated the Disciplinary Rules;

● O'Hara should return all of Plaintiffs' files;

● O'Hara should produce all of his communications with third parties concerning NXIVM;

● O'Hara should submit to an additional day of deposition;

● Ross' Subpoena should be quashed;

● Ross should not be allowed to depose O'Hara; and

● Communications between O'Hara and NXIVM are privileged or work product and there is no waiver of either the attorney client privilege or work product doctrine.

### B. O'Hara

● No attorney-client relationship existed between O'Hara and NXIVM prior to July 1, 2004;

● No privilege exists for non-legal communications, business advice or disclosure to third-parties;

● NXIVM's investigation of Ross falls within the crime/fraud exception of the attorney-client privilege;

● Plaintiffs' Motion to Compel should be denied;

● There was a third-party waiver; and

● New York Law should provide the standard of review.

### C. Intervenor Ross

● The Court should stay its decision and defer to the adjudication of the issues by the District Court of New Jersey;

● Interfor Investigation is subject to the crime/fraud exception to the attorney-client and work product privileges;

● Ross is entitled to discover what other criminal mischief NXIVM and Interfor conspired to commit;

● NXIVM has waived any attorney-client privilege either by sharing it with a third-party or an at-issue waiver; and

● NXIVM's work product—Interfor Report—is necessary to prosecute Ross' counterclaims.

One could argue that there is no need for a further protective order since there exists a Confidentiality Stipulation/Order. *See* Dkt. Nos. 47 & 48; *see also supra* Section I.B. at p. 15. Yet, this Confidentiality Stipulation/Order permits any party to apply to the court for a further protective order relating to any document. Dkt. No. 48 at ¶ 13. The genesis for seeking a protective order, pursuant to FED. R. CIV. P. 26(c) and the Court's inherent discretion, is to stop O'Hara from "exacerbating Plaintiffs' damages by setting out on a campaign to reveal the Plaintiffs' Protected Information." Dkt. No. 57, Pls.' Mem. of Law at p. 15. Similarly, notwithstanding O'Hara's previous disclosure of the Interfor Report, it can be construed that his opposition to NXIVM's Omnibus Motion in seeking full disclosure of this Report also complies with the terms of the Confidentiality Order. *Id.* at ¶¶ 8 & 11. Therefore, these issues are properly before this Court.

## III. DISCUSSION

### A. Intervenor's Motion for this Court to Stay and Defer to the District of New Jersey

This Court finds itself in an atypical dilemma having to grapple with a number of issues that are being concurrently decided by another District Court. As we noted above, *NXIVM v. O'Hara et al.*, and *NXIVM v.*

*Ross, et al.,* are on nearly parallel tracks and timetables. These two cases overlap in several materials respects—facts, issues, and key players. Moreover, NXIVM has filed Motions for a Protective Order and to Quash Ross' Subpoenas, primarily directed at the Interfor Report and O'Hara's role in all of these matters, in both this Court and the District Court for the District of New Jersey. Coincidentally, all of the motion papers, oppositions, and corresponding exhibits before both courts are virtually identical, and the motion calendar for both Courts are almost contemporaneous. To reiterate, Ross served a subpoena upon O'Hara to depose him about the Interfor Report, sting operations, and probably other related issues. By moving to quash that subpoena and seeking a protective order, NXIVM wishes to prevent O'Hara from discussing with any third-party purportedly confidential information. Since O'Hara works and resides in this District, Ross' subpoena upon him is properly before this Court. FED. R. CIV. P. 45(b)(2).

 Intervenor Ross argues that the District Court in New Jersey is in a better position to determine the "nature of the NXIVM–Interfor plot and the applicability of the crime-fraud exception" to the attorney client privilege, and thus we should defer our decision until the New Jersey Motions are decided. Dkt. No. 67, Intervenor's Mem. of Law at p. 16. Further, Ross contends that at the time he submitted his opposition to NXIVM's Motions in this Court, presumably New Jersey already had a "fully briefed" set of motions, and thus was ahead in terms of a court's review. *Id.* We concur with Ross that there is a possibility of inconsistent rulings and duplication, which should be avoided, and certainly the District Court of New Jersey is keenly aware of what is relevant to its case and hence capable of deciding those issues accordingly. However, we respectfully decline Ross' invitation to defer to the District Court in New Jersey.

First, New Jersey does not have jurisdiction to assess the issues germane to this New York litigation, even though there are some factual similarities between the two litigations. The claims of attorney-client privilege and possible breach of a lawyer's ethical obligation are soundly grounded in this jurisdiction and the examination of those matters based upon New York law by this Court are inescapable, as much as the District Court of New Jersey has to wrestle with the New Jersey based facts and issues. Furthermore, if the District Court of New Jersey were to make rulings that may be pertinent to our set of Motions, such rulings would only be persuasive and not controlling, and inversely. This Court is obligated to rule on the pending Omnibus Motion nonetheless.

But, the request to defer may be moot. On January 9, 2007, NXIVM's Motion for a Protective Order, NXIVM's and Interfor's Motion to Quash Ross' Subpoena, and Ross' Motion to Amend were heard before the Honorable Mark Falk, United States Magistrate Judge. NJ Tr., dated Jan. 9, 2007. Magistrate Judge Falk made rulings on the records, which were eventually reduced to a written Order. The Court (1) denied NXIVM's Motion to Seal the Record, (2) granted NXIVM's Motion for a discovery confidentiality order, (3) denied NXIVM's and Interfor's Motion to Quash, and (4) granted in part and denied in part Ross' Motion to Amend. New Jersey Order, dated Jan. 10, 2007. As Plaintiffs so incisively note, Magistrate Judge Falk did not decide whether O'Hara was NXIVM's attorney nor decide whether "O'Hara's legal obligation of confidentiality were somehow obviated by his accusation" of a crime or fraud. Dkt. No. 78, Defs. Lt.-Br., dated Jan. 26, 2007; *see also* NJ Tr.

Therefore, Ross' Motion to Stay our decision is **denied.**

### B. Previous Court Order

In support of its Motion for a Protective Order, NXIVM alerts the Court that O'Hara violated this Court's March 27, 2006 Order, which directed that he not disclose the Interfor Report, among others, until the Court resolved the matters. Text Order, dated March 27, 2006 ("In the interim, Defendant O'Hara shall not publicly disclose the documents claimed to be privileged until the Court has conferred with the parties and, to the extent necessary, decided the issued."); *see supra* Section I.B. at pp. 15–16. The

repercussion for violating this Order has not been clearly suggested to the Court. However, and pertinent to these Motions, we know that O'Hara disclosed the Interfor Report to Ross and discussed with him its contents and maybe more on July 12, 2006. We can safely presume that O'Hara discussed and disclosed the same Report with Chet Hardin of *Metroland* Newspaper. Other information, much in the same vein as the Interfor Report, was shared with the Suttons, and there could have been others.

On its face, it would appear that O'Hara blatantly ignored our March 27, 2006 Order by speaking with Ross, the reporter and others, and approximate sanctions or consequences should ensue. But the ability to enforce that Order upon O'Hara has been seriously dissipated by the subsequent Confidentiality Stipulation/Order, dated July 20, 2006, and NXIVM's strategic tactic not to submit the Confidentiality Stipulation for nearly three months. The enforceability of the Stipulation was deferred to the detriment of NXIVM. NXIVM received this Stipulation on April 20, 2006, and yet, for whatever reason, delayed signing the agreement until July 19, 2006, and then submitted it to the Court the following day. Until NXIVM signed the Stipulation, there was no enforceable confidentiality agreement or order, with the exception of our March 27th Order.

Cleverly, O'Hara inserted a provision within the Confidentiality/Stipulation that has retroactive ramifications: "However, this Stipulation shall only govern disclosure and release of documents occurring or intended to occur after the date of this agreement [July 19, 2006]. Thus, this Stipulation shall not constitute evidence of an alleged prior disclosure of materials claimed to be protected by the attorney-client privilege or work product doctrines. Similarly, to the extent that there have been any such prior disclosures, this Stipulation shall not constitute evidence of ratification of any such disclosures by the holder of any such privilege." Dkt. Nos. 47 & 48 at ¶ 14. NXIVM decries surprise arguing that it never anticipated that this provision would be retroactive though, contrary to that declaration, the rec-

ord indicates that the parties haggled over this provision through emails, with O'Hara insisting that it remain in the Stipulation and consequently NXIVM acquiescing, however with a modification of its own. *Id.;* Dkt. No. 57, Ex. E. Moreover, the clear meaning of this provision strikes a discordance with NXIVM's current posture and interpretation. Now to NXIVM's chagrin, had it signed the Stipulation upon receipt and delivered it to the Court promptly rather than tactically withholding it, there might be some aftermath to O'Hara's disclosure and revelations. In terms of this Omnibus Motion, because of this Stipulation and the belated executed, O'Hara gets a reprieve for his discussion with third parties prior to July 20, 2006. Thus, O'Hara's failure to abide by the March 27th Order has no further bearing on NXIVM's Application for a Protective Order.[20]

### C. Attorney–Client Privilege and Work Product Doctrine

#### 1. Attorney–Client Privilege

One manner in which to seek a protective order is to assert that the documents and the information to be protected is shielded by the attorney-client privilege and/or the work product doctrine. NXIVM has made both of those claims.

We acknowledge that the causes of actions filed against Defendants are common law claims that should be governed by New York law. The same should hold true when the attorney-client privilege is invoked. Nevertheless, the distinction between New York and federal law on attorney-client privilege is quite indistinguishable, as the law intersects in all of its facets, and are viewed interchangeably. *Bank of Am., N.A. v. Terra Nova Ins. Co. Ltd.,* 211 F.Supp.2d 493 (S.D.N.Y.2002) ("New York law governing attorney-client privilege is generally similar to accepted federal doctrine.") (citations omitted). As such, the attorney-client privilege is a longstanding, common law privilege recognized in New York and by the federal courts under FED. R. EVID. 501. This privilege encourages full engagement between a

---

20. We intimate no view as to its implication on the underlying merits of this litigation.

party and her attorney so that full and frank communication exists to impart all the information an attorney may need in order to give sage and cogent advice on the matter. *Swidler Berlin v. United States*, 524 U.S. 399, 403, 118 S.Ct. 2081, 141 L.Ed.2d 379 (1998); *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir.1989) ("[The] communications between attorney and client endure as the oldest rule of privilege known to the common law."). Stated another way, its essential purpose is to encourage clients to be fully forthcoming with their attorney and to receive, in return, advice which will protect the clients' legal rights. *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981); *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir.1991); *Asian Vegetable Research & Dev. Ctr. v. Inst. of Int'l Educ.*, 1996 WL 14448, at *4 (S.D.N.Y. Jan.16, 1996) (citing, *inter alia, In re Horowitz*, 482 F.2d 72, 81 (2d Cir.), *cert. denied*, 414 U.S. 867, 94 S.Ct. 64, 38 L.Ed.2d 86 (1973)); *People v. Mitchell*, 58 N.Y.2d 368, 373, 461 N.Y.S.2d 267, 448 N.E.2d 121 (1983). The free-flow of information and the twin tributary of advice are the hallmarks of the privilege. For all of this to occur, there must be a zone of safety for each to participate without apprehension that such sensitive information and advice would be shared with others without their consent. *In re Grand Jury Subpoena Duces Tecum Dated November 16, 1974*, 406 F.Supp. 381, 386 (S.D.N.Y. 1975) ("The *sine qua non* of the attorney-client-privilege is . . . a confidence reposed . . . .").

█ When determining if there is in fact an attorney-client privilege present to cloak both the client's communication and the corresponding legal advice, a court needs to ascertain that this safety net attaches to only those communications (1) where legal advice of any kind is sought, (2) from a professional legal advisor in his or her capacity as such, (3) the communication relates to that purpose, (4) made in confidence, (5) by the client, and (6) are at his or her insistence perma-

nently protected, (7) from disclosure by the client or the legal advisor, (8) except if the protection is waived. *United States v. Int'l Bhd. of Teamsters*, 119 F.3d 210, 214 (2d Cir.1997) (citing *In Re Grand Jury Subpoena Duces Tecum*, 731 F.2d 1032, 1036 (2d Cir.1984)); *Madanes v. Madanes*, 199 F.R.D. 135, 143 (S.D.N.Y.2001) (citing, *inter alia, In re Richard Roe, Inc.*, 68 F.3d 38, 39–40 (2d Cir.1995) & quoting *United States v. Kovel*, 296 F.2d 918, 921 (2d Cir.1961)); *see also* 8 WIGMORE, EVIDENCE § 2292 (McNaughton rev. ed.1961). This privilege, as previously stated, further attaches to the advice rendered by the attorney. *In re County of Erie*, 473 F.3d 413, 417 & 419 (2d Cir.2007) (citing *United States v. Constr. Prod. Research, Inc.*, 73 F.3d 464, 473 (2d Cir.1996) (listing the elements that include that the communication is made "for the purpose of obtaining or providing legal advice")); *In re Six Grand Jury Witnesses*, 979 F.2d 939, 943–44 (2d Cir.1992). The burden of proving each element of the privilege rests on the party claiming the protection. *In re Horowitz*, 482 F.2d at 82; *United States v. Stern*, 511 F.2d 1364, 1367 (2d Cir.1975) (cited in *Von Bulow v. Von Bulow*, 1986 WL 11783, at *3 (S.D.N.Y. Oct.15, 1986) for the proposition that "it is axiomatic that the burden is on a party claiming the essential elements of the privileged relationship").

Contrary to modern yet ill-informed perceptions, the attorney-client privilege is often "[n]arrowly defined, riddled with exceptions, and subject to continuing criticism." *United States v. Schwimmer*, 892 F.2d at 243. Grand as the privilege stands in our legal lexicon, it is nonetheless narrowly defined by both scholars and the courts. *Univ. of Pa. v. E.E.O.C.*, 493 U.S. 182, 189, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990); *In re County of Erie*, 473 F.3d 413, 417–18 (finding that the privilege is narrowly construed and "appl[ies] only where necessary to achieve its purpose") (citing, *inter alia, Fisher v. United States*, 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976)).[21] The attorney-client privilege is not

---

**21.** There is the general maxim that the public, particularly within the judicial forum, is entitled to be exposed to "everyman's evidence." 8 WIGMORE, EVIDENCE § 2317 (McNaughton rev.

ed.1961). The quest is for the truth of the matter to flow forward before the court, and "[t]he suppression of truth is a grievous necessity at best . . . [only justified] when the opposed private

126

given broad, unfettered latitude to every communication with a lawyer, but is to be narrowly construed to meet this narrowest of missions. *Fisher v. United States*, 425 U.S. 391, 403, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976) ("However, since the privilege has the effect of withholding relevant information from the factfinder, it applies only where necessary to achieve its purpose."); *see also In re Horowitz*, 482 F.2d at 81 (privilege ought to be "strictly confined within the narrowest possible limits consistent with the logic of its principle") (quoting 8 WIGMORE § 2292 at 70); *United States v. Int'l Bhd. of Teamsters*, 119 F.3d at 214.

 In today's world, an attorney's acumen is sought at every turn, even average attorneys mix legal advice with business, economic, and political. *In re County of Erie*, 473 F.3d 413, 2007 WL 12024, at *5; *MSF Holding, Ltd. v. Fid. Trust Co. Intern.*, 2005 WL 3338510, at *1 (S.D.N.Y. Dec. 7, 2005) (in-house counsel often fulfill the dual role of legal advisor and business consultant); *Rattner v. Netburn*, 1989 WL 223059, at *6 (S.D.N.Y. Jun.20, 1989); Many attorneys have actually established dual professional practices in order to provide a multitude of relevant advice, not necessarily confined to law advice. Some thoughtful lawyers establish professions independent of the practice of law. And oftentimes the line of demarcation as to the nature of the advice is blurred. "Attorneys frequently give to their clients business or other advice which, at least insofar as it can be separated from essentially professional legal services, give rise to no privilege whatsoever." *Colton v. United States*, 306 F.2d 633, 638 (2d Cir.), *cert denied* 371 U.S. 951, 83 S.Ct. 505, 9 L.Ed.2d 499 (1963). "When an attorney is consulted in a capacity other than as a lawyer, as (for example) a policy advisor, media expert, business consultant, banker, referee or friend, that consultation is not privileged." *In re County of Erie*, 473 F.3d 413, 421–22 (citing *In re Lindsey*, 148 F.3d 1100, 1106 (D.C.Cir.

1998)). The privilege is "triggered only" by a request for legal advice, not business advice. *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1037 (2d Cir.1984); *Elliott Assoc. L.P. v. Republic of Peru*, 176 F.R.D. 93, 97 (S.D.N.Y.1997) (finding that the communication is not cloaked if the lawyer is hired for business or personal advice); *Fine v. Facet Aerospace Products Co.*, 133 F.R.D. 439, 444 (S.D.N.Y.1990) (privilege not extended to management advice). If the communication between client and lawyer "is not designed to meet problems which can fairly be characterized as predominately legal, the privilege does not apply." *Rattner v. Netburn*, 1989 WL 223059, at * 6; *In re County Erie*, 473 F.3d 413, 419–22 (ruling that the predominant purpose of the advice is to solicit or gain legal advice); *United States Postal Serv. v. Phelps Dodge Refining Corp.*, 852 F.Supp. 156, 160 (E.D.N.Y.1994) ("The Communication must be made to the attorney acting in her capacity as counsel."). In this framework, if a business decision can be viewed as both business and legal evaluations, "the business aspects of the decision are not protected simply because legal considerations are also involved." *Hardy v. New York News, Inc.*, 114 F.R.D. 633, 643–44 (S.D.N.Y. 1987).

### 2. Work Product Doctrine

 Whenever the attorney-client privilege is raised in on-going litigation, concomitantly the work product doctrine is virtually omnipresent. They are inseparable twin issues, and when one is advanced, surely the other will follow. The work product privilege is more broad than the attorney-client privilege. *In re Grand Jury Proceedings*, 219 F.3d 175, 190 (2d Cir.2000). This privilege exists to protect attorneys' mental impressions, opinions, and/or legal theories concerning litigation. *Horn & Hardart Co. v. Pillsbury Co.*, 888 F.2d 8, 12 (2d Cir.1989). Indeed, the work product privilege is de-

---

interest is supreme." *In re Megan–Racine Assocs., Inc.*, 189 B.R. 562, 570 (Bankr.N.D.N.Y. 1995) (quoting *McMann v. Sec. and Exch. Comm'n*, 87 F.2d 377, 378 (2d Cir.1937)). But since the attorney-client privilege "stands in derogation of the public's right to everyman's evi-

dence, ... it ought to be strictly confined within the narrowest possible limits consistent with the logic of the principle." *In re Grand Jury Proceedings*, 219 F.3d 175, 182 (2d Cir.2000) (citing *United States v. Int'l Bhd. of Teamsters*, 119 F.3d at 214).

signed to protect an adversarial system of justice and has been analyzed in that context by the Supreme Court in *Hickman v. Taylor*, 329 U.S. 495, 510–11, 67 S.Ct. 385, 91 L.Ed. 451 (1947). This doctrine establishes a "zone of privacy" in which a lawyer can prepare and develop theories and strategies with an eye towards litigation free from unnecessary intrusion by his or her adversaries. *United States v. Adlman ("Adlman I")*, 68 F.3d 1495, 1500–01 (2d Cir.1995) (citing *United States v. Nobles*, 422 U.S. 225, 238, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975) & *Hickman v. Taylor*, 329 U.S. at 516, 67 S.Ct. 385); *see also In re Minebea Co., Ltd.*, 143 F.R.D. 494, 499 (S.D.N.Y.1992). Of course the burden, albeit not a heavy one, of establishing that the work product doctrine applies rests with that party's attorney who is claiming the protection. The work product doctrine, as well as the attorney-client privilege, "does not extend to every document generated by the attorney; it does not shield from disclosure everything a lawyer does." *Rattner v. Netburn*, 1989 WL 223059, at *6. The doctrine is generally invoked as soon as the attorney, in responding to a request for production of documents, serves upon the requesting party a privilege log asserting this and any other relevant privilege or provides notification that it will not be disclosed for this reason. FED. R. CIV. P. 26(b)(5) & 34(b). Failure to timely provide the privilege log, as discussed above, or objection constitutes a waiver of any of the asserted privileges. Even if a party follows these steps, the security of the work product doctrine is not assured. There must be the omnipresent concern that revealing the attorney's mental processes is real and not just speculative. *Gould Inc. v. Mitsui Mining & Smelting Co., Ltd.*, 825 F.2d 676, 680 (2d Cir.1987).

FED. R. CIV. P. 26(b)(3) provides a relevant rule on the discovery of work product material. It reads in part:

[A] party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against the disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

█ It is important to note that the work product doctrine classifies documents into two categories: "non-opinion" work product and "opinion" work product. The distinction between these two categories turns on the effort employed in obtaining disclosure pursuant to Rule 26(b)(3). For "non-opinion" work product, the party seeking this information must show a substantial need for the document and undue hardship to acquire the document or its substantial equivalent by other means. On the other hand, "opinion" work product requires a higher protection to the extent that the requesting party has to demonstrate extraordinary justification before the court will permit its release. *Strougo v. BEA Assocs.*, 199 F.R.D. 515, 521 (S.D.N.Y.2001) (citing *In re Sealed Case*, 676 F.2d 793, 809–10 (D.C.Cir.1982)); *see also Upjohn Co. v. United States*, 449 U.S. at 401, 101 S.Ct. 677. At a minimum, such "opinion" work product should remain protected until and unless a highly persuasive showing is made. *In re Grand Jury Proceedings*, 219 F.3d at 191; *United States v. Adlman ("Adlman II")*, 134 F.3d 1194, 1204 (2d Cir.1998). In a similar vein, in most instances, the work product doctrine does not extend to facts. Generally, non-privileged facts should be freely discoverable. *Compare In re Savitt/Adler Litig.*, 176 F.R.D. 44, 48 (N.D.N.Y. 1997) *with In re Grand Jury Subpoena Dated Oct. 22, 2001*, 282 F.3d 156, 161 (2d Cir. 2002).

██ "[W]here a party faces the choice of whether to engage in a particular course of conduct virtually certain to result in litigation and prepares documents analyzing whether to engage in the conduct based on its assessment of the likely result of the

anticipated litigation, [it should be] conclude[d] that the preparatory documents should receive protection under Rule 26(b)(3)." *Adlman II,* 134 F.3d at 1196. The crux being that a document which has been prepared because of the prospect of litigation will not lose its protection under the work product doctrine, even though it may assist in business decisions. *Strougo v. BEA Assocs.,* 199 F.R.D. at 521 ("Where a document is created because of the prospect of litigation, analyzing the likely outcome of that litigation, it does not lose protection under this formulation merely because it is created to assist with a business decision." (citing *Adlman II,* 134 F.3d at 1202)); *Adlman I,* 68 F.3d at 1502. But this protection will not be extended, under any circumstances, to records that are prepared in the ordinary course of business. *Adlman II,* 134 F.3d at 1202; *Adlman I,* 68 F.3d 1502. Even though the work product doctrine protects the impressions, opinions, theories, and strategies of an attorney, Rule 26(b)(3) makes clear that the document at issue, either obtained or prepared by or for a party, or by or for his representative, may be cloaked by this doctrine as well. *Id.* This maxim makes sound sense considering how complex litigation can be and the undeniable need for others to assist in developing all that is necessary to prosecute or defend a lawsuit. Obviously, impressions and strategies are not always created in a vacuum, but, rather are generated in cogent discourse with others, including the clients and agents. Further, the exchange of such documents and ideas with those whose expertise and knowledge of certain facts can help the attorney in the assessment of any aspect of the litigation does not invoke a waiver of the doctrine. *United States v. Nobles,* 422 U.S. at 239, 95 S.Ct. 2160; *Adlman I,* 68 F.3d at 1502.

### 3. Analysis of the NXIVM/O'Hara Relationship

Notwithstanding the current Confidentiality Stipulation/Order, NXIVM seeks an additional protective order to prevent O'Hara, who has been prone to sharing sensitive information with third parties, from continuing to dispense purportedly protected information. NXIVM's request seems to cover "any information that [O'Hara] learned in the course of his work with NXIVM, including any documents that he received or documents that he created in connection with his work for Plaintiffs." Dkt. No. 57, Proposed Order. Herein, NXIVM emphatically asserts that O'Hara has been its attorney since October 2003 and all of its communications are protected by either the attorney-client privilege or work product doctrine, and because there is an attorney-client privilege, O'Hara does not have authority, implicit or otherwise, to disclose the content of those communications and documents without NXIVM's consent. *Maloney v. Sisters of Charity Hosp. of Buffalo, New York,* 165 F.R.D. 26, 29 (W.D.N.Y.1995) (citing, *inter alia, In re von Bulow,* 828 F.2d 94, 100 (2d. Cir.1987) ("An attorney may not waive the privilege without his client's consent.")); *Connecticut Mut. Life Ins. Co. v. Shields,* 18 F.R.D. 448, 451 (S.D.N.Y.1955). NXIVM's privileges are broadly rather than specifically asserted, although NXIVM has provided a Privilege. Log at the Court's direction. Dkt. No. 41, Attach. 1; Dkt. No. 57, Ex. A. Because in NXIVM's view O'Hara was its attorney, he has breached an attorney Discipline Rule by disclosing Protected Information.[22] Conversely, O'Hara disagrees and states that he was not acting as an attorney during the period prior to July 2004, and curiously takes no position whether he was acting as an attorney, under the auspices of TOGA PLLC, from July 1, 2004 to January 2005. With this obvious divergence on the nature of their relationship, the burden of establishing an attorney-client relationship rests with the party invoking it, NXIVM. *In re County of Erie,* 473 F.3d 413, 417–18 (citations omitted). In meeting this burden, NXIVM "must do so by competent and specific evidence,

---

**22.** NXIVM submits that O'Hara breached both or either the Washington, D.C., and New York Disciplinary Rules. Dkt. No. 57, Pls.' Mem. of Law at pp. 16–24. The Discipline Rules in question are virtually synonymous. New York Discipline Rule, DR 4–104(b)(1), reads in part that "a lawyer shall not reveal a confidence or secret of a client." N.Y. COMP. CODES R. & REGS, tit. 22 § 1200.19(B)(1).

rather than by conclusory or *ipse dixit* assertions." *In re Omnicom Group, Inc. Securities Litig.*, 233 F.R.D. 400, 404 (S.D.N.Y. 2006) (citing, *inter alia, United States v. Doe,* 219 F.3d 175, 182 (2d Cir.2000)). In order to address whether there was an attorney-client relationship, we will consider the record in stages—before July 1, 2004, the date of the reformulation of TOGA PLLC, and after July 1, 2004.

NXIVM, supported by a coterie of others, contends that it hired O'Hara for legal representation. *See* Dkt. No. 57, Exs. AE–AJ. O'Hara's rejoinder is that he was hired to be a Strategic Plan Coordinator/Consultant Advisor. NXIVM refers to certain documents and transactions to support its contention, whereas, O'Hara says that none of these references lend support to meeting its burden. Dkt. No. 57, Salzman Decl., at ¶ 5 & Exs. A–F, AD, Keefe Decl. O'Hara argues that he told NXIVM representatives that he did not practice law and could not act as their lawyer. Those representatives retort that O'Hara never made such claims and they always believed that he was their counsel based partially on either his admissions or representations. Initially, it would appear that this subject is nothing more than a grand matter of credibility—a he said/she said folly. But the Court is able to peer behind this credibility mire and make a determination which does not necessarily have to rely totally upon any party's averments or arguments.

Even though O'Hara was not licensed to practice law in New York and TOGA LLC promoted itself as a lobbying and marketing firm, NXIVM argues that O'Hara always acted as its attorney, relying upon the reasoning that if the client entertains a reasonable good faith belief that the person is a lawyer, then such person is acting in that capacity. *United States v. Ostrer,* 422 F.Supp. 93, 97 (S.D.N.Y.1976). If that were true that we rely solely upon subjective beliefs of the client, then why would the courts labor so strenuously and consistently to create objective elements to help others determine whether an attorney-client relationship truly exists. *See United States v. Int'l Bhd. of Teamsters,* 119 F.3d 210, 214 (2d Cir.1997).[23] This Court is not prepared to accept one party's personal view to determine the facts, especially in a disputed case such as this, and even if we did, it is not relevant. As we know, an attorney can act as a legal advisor one day and the next day provide other advice which does not deserve the broad protection afforded by the attorney-client privilege. The issue is not the client's belief that a professional may be acting as an attorney but rather the issue is for what purpose was the lawyer retained. More keenly, it is the nature of the communication that controls. As the Second Circuit has consistently stated, we look to see whether the primary or predominate purpose of the communication was to procure legal advice, which suffices to say that we also look at the primary or predominate purpose for retaining the lawyer/professional. *In re County of Erie,* 473 F.3d 413, 420, n. 7 ("The predominate-purpose rule is the correct one."). In order to determine what was the primary or predominate purpose of the relationship and thus nature of most of the communications,

**23.** The law in New York is not settled on the notion of the putative attorney. Some courts in and out of the state have attempted to carve out rules to help determine the reasonableness of a client's belief that a person has held herself out as attorney. *Fin. Tech. Int'l, Inc. v. Smith,* 2000 WL 1855131, at *4–6 (S.D.N.Y. Dec.19, 2000) (citing *United States v. Boffa,* 513 F.Supp. 517, 523 (D.Del.1981)). But any attempt to adopt such a rule still remains in flux, with some courts rejecting or modifying it. For example, the Honorable Raymond Ellis, United States Magistrate Judge, grappled with this issue and came to the conclusion that "even if New York would apply the reasonable belief exception to individuals, corporations would have to make sure their attorneys are in fact attorneys." *Id.* at *7; *see also* *A.I.A. Holdings, S.A. v. Lehman Bros., Inc.,* 2002 WL 31385824, at *4 (S.D.N.Y. Oct.21, 2002) ("Thus, in the absence of an excusable mistake of fact, even if all the other requirements of the privilege are met, communications between 'client' and an unadmitted law school graduate are not privileged even where the putative 'attorney' has passed the bar examination."). Plaintiff's plaintive argument that we should follow this rule will be rejected, and if we were to follow Magistrate Judge Ellis's analysis, since NXIVM is a corporation it should have made sure O'Hara was properly licensed. Considering New York's ambiguity on this principle of law, we will rely upon the content, context and form of the communication.

we turn to the Professional Service Agreement as our guide. Dkt. No. 68, Exs. F & G.

The Professional Service Agreement clearly denotes that O'Hara, as Strategic Plan Coordinator, was providing much more than legal services, if that. He was coordinating media, public relations, lobbying, and other non-legal services, and throughout the Agreement he is referred to as a consultant, not as counselor or attorney. Thus, O'Hara was wearing multiple hats and if he was advising NXIVM on anything and everything other than legal services, whether business, media, public relations, or lobbying, there is no attorney-client privilege. The *sine qua non* that inextricably supports the notion that the parties meant to limit his role as legal counselor to only one of coordinator of legal service, whatever that might entail, is the disclaimer that "it is mutually understood and agreed that the Consultant [O'Hara] will not provide any direct legal services to the Company." Dkt. No. 68, Ex. G at p. 1. Moreover, the Professional Service Agreement specifically mentions that O'Hara would help identify law firms to represent NXIVM on various matters. As coordinator of legal services, however, O'Hara may have participated in communications providing legal advice or had become privy to documents prepared in anticipation of litigation, but the burden of proving such participation remains with NXIVM.

 Rather than provide specificity, NXIVM relies upon a broad extrapolation of its attorney-client relationship. We were not provided with specific communications in order to determine the primary purpose for those communications. NXIVM presents several exhibits but they are of little value and lend *de minimis* support, if any, to the impression that there was an attorney-client relationship. *See* Dkt. No. 57, Exs. A–F. Also, we have a privilege log listing fifteen items, the same items O'Hara shared with NXIVM during the initial mandatory disclosure.[24] Dkt. No 41; Dkt. No. 57, Rennie Decl., Ex. D; Dkt No. 67, Ross Ex. A. A

proponent of a privilege log must "make the claim expressly and shall describe the nature of the documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection." FED. R. CIV. P. 26(b)(5). In this respect, and in order to evaluate and facilitate the determination of whether a privilege exists, courts generally require compliance with the statutory mandate that an adequately detailed privilege log be provided. *United States v. Constr. Prod. Research, Inc.,* 73 F.3d at 473 (citations omitted). Without an adequately detailed privilege log, the courts are hamstrung in attempting to decipher the presence and extent of the claimed privilege. To constitute an acceptable privilege log, at a minimum, it should provide facts that would establish each element of the claimed privilege as to each document, *Strougo v. BEA Assoc.,* 199 F.R.D. at 519, and "identify each document and the individuals who were parties to the communications, providing sufficient detail to permit a judgment as to whether the document is at least potentially protected from disclosure. Other required information, such as the relationship between individuals not normally within the privileged relationship, is then typically supplied by affidavit or deposition testimony." *United States v. Constr. Prod. Research, Inc.,* 73 F.3d at 473. Where a party fails to comply with the requirements of Rule 26(b)(5) when submitting a privilege log, which is inadequate as a matter of law in that the log does not provide sufficient information to support the privilege, the claim of privilege may be denied. *Johnson v. Bryco Arms,* 2005 WL 469612, at *3–4 (E.D.N.Y. Mar.1, 2005) (citing *United States v. Constr. Prod. Research, Inc.,* 73 F.3d at 474).

Here, in certain respects, NXIVM's Privilege Log is inadequate and the "dearth of information [within the Log] is so [in]complete that the listing[s] [therein are] the func-

---

24. At the time O'Hara served his initial mandatory disclosure, he had designated the documents listed on the privilege logs as G to R. When serving NXIVM with the mandatory disclosure in February 2006, O'Hara asked NXIVM to advise him whether it considered these items privileged, which NXIVM did. In March 2006, NXIVM made its initial overture to the Court to hold these documents confidential.

tional equivalent of no listing at all." *A.I.A. Holdings, S.A. v. Lehman Bros., Inc.,* 2000 WL 1538003, at *3 (S.D.N.Y. Oct.17, 2000). The Court could declare all of the purported privileges waived. And, yet, adjudging all of these documents as waived would be too austere a remedy when the deficiencies can be readily rectified at this juncture of the litigation. *Export–Import Bank of United States v. Asia Pulp & Paper Co., Ltd.,* 232 F.R.D. 103, 111 (S.D.N.Y.2005) (although finding the privilege log inadequate, the court directed that a new privilege log be promulgated). Furthermore, the Court is able to decode enough information from the Log, when supplemented by the all of the submissions, to appreciate, at least, the support or disputation of the privilege. Hence, the Court will not adopt O'Hara's importune to waive *carte blanche* the privileges due to NXIVM's failure to comply with the Federal Rules. If any waivers are applicable, it will be determined on the merits, document by document, and not completely on the failure to provide sufficient information within the Log.

 Weighing the multi-purpose consultation performed by O'Hara from October 2003 to July 1, 2004, and the descriptions provided for each of the documents listed within the Privilege Log, we find that NXIVM has failed to establish that the documents designated as G, H, I, J, K, M, and O are protected by either the attorney-client privilege or the work product doctrine. Many of the documents listed appear to be for business and non-legal advice, which are not protected. *Lugosch v. Congel,* 219 F.R.D. 220 (N.D.N.Y.2003).

Now shifting our attention to the period July 2004 until March 11, 2005, we find that the parties professional relationship was transformative. It is undisputed that O'Hara re-constituted his Washington, D.C. law practice as TOGA PLLC, in July or October 2004, for the sole purpose of cloaking all of their communications under the attorney-client privilege. Although an attorney-client relationship is clearly established after this date, their collective belief, at that time, that all of the conversations and communications were protected is misplaced and totally erro-neous. We must not forget, and the parties fail to consider, that, in order to receive protections the predominate purpose of the specific communication is to seek legal advice in order to receive protection and not some all encompassing legal blanket attempt to shield them from the chill of prying eyes and ears. We cannot ignore that O'Hara may have continued to provide other important instruction to NXIVM during this period that fell outside the legal advice purview, and yet a juxtaposition persisted. Whether initiated or confronted by NXIVM, its business and social landscape bristled with litigation. Within that litigation environment included potential litigation with Rick Ross, Toni Natalie, and others.

Even though Nolan and Heller, and then other law firms, represented NXIVM in its lawsuit against Ross, Sutton, Franco, and others, O'Hara may have been privy to protected information throughout. Even if O'Hara did not provide legal advice, which we confidently believe that he may, he was exposed to attorney work product. The record before us establishes that O'Hara may have tangentially assisted NXIVM in its lawsuit against Ross and, in doing so, generated documents prepared in anticipation of litigation. Referring to the Privilege Log, based upon the record before us, we determine that documents designated N, Q, S, T, and U, which include the infamous Interfor Report, were prepared as work product, warranting protection.

Although Nolan and Heller referred NXIVM to Interfor, and at the insistence of Raniere, it was TOGA PLLC, on behalf of NXIVM, that signed a retainer agreement with Interfor to first investigate the Kristen Snyder matter. Dkt. No. 68, O'Hara Decl., at ¶ 23. Subsequently, Interfor's investigation included Ross, and the record clearly indicates that O'Hara was fully aware of that development albeit unaware of the investigative methodology or tactics. At the time of the retainer agreement and the Interfor investigation, NXIVM had already sued Ross. Consequently, any report that Interfor would generate on behalf of NXIVM that pertain to Ross would be deemed work product.

Despite our finding that these documents are cloaked with some protections, O'Hara and Ross, at least in terms of the Interfor Report, repugn that the confidentiality shield should be pierced because of a third-party or at issue waiver, or the crime/fraud exception. We must now consider whether there has been a waiver.

### D. Crime/Fraud Exception to the Attorney–Client Privilege and Work Product

Both O'Hara and Ross advert to the manner in which Interfor conducted the Ross sting operation and, because of Interfor's conduct in pursuing that investigation, they ask the Court to apply the crime/fraud exception to the attorney-client privilege and/or work product doctrine to pierce any confidentiality protection that might exist. In weighing whether to grant their request, we note that we are dealing with two unique sets of facts that have unfolded in stages. The first stage pertains to the Interfor Report, dated November 23, 2004. And the second stage or circumstance is the sting operation that probably commenced on or about November 22, 2004, and continue at least until April 2005.

The courts have recognized such an exception to the attorney-client privilege and work product doctrine for communications between lawyers and clients that are designed to facilitate or even conceal the commission of a crime or fraud. *Clark v. United States,* 289 U.S. 1, 15, 53 S.Ct. 465, 77 L.Ed. 993 (1933) ("The [attorney-client] privilege takes flight if the relation is abused. A client who consults an attorney for advice that will serve him in the commission of a crime or fraud will have no help from the law. He must let the truth be told."); *In re Richard Roe,* 68 F.3d 38, 39–40 (2d Cir.1995) (the issue is whether the communications were made to further that crime or fraud); *In re John Doe, Inc.,* 13 F.3d 633, 636 (2d Cir.1994); *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983,* 731 F.2d 1032, 1041 (2d Cir. 1984); *In re John Doe Corp.,* 675 F.2d 482, 491 (2d Cir.1982); *United States v. Bob,* 106 F.2d 37, 40 (2d Cir.1939). The Second Circuit, realizing the attorney-client privilege

and work product immunity "substantially overlap," ruled that there was no need for a different piercing standard for attorney work product. *In re Richard Roe,* 68 F.3d at 41, n. 2; *see also In re John Doe Corp.,* 675 F.2d at 492.

 To assert this exception, the discovering party must demonstrate reasonable cause to believe that a crime or fraud has been committed or was intended **and** that the attorney-client communication was intended to facilitate or conceal the misconduct. *United States v. Jacobs,* 117 F.3d 82, 87 (2d Cir.1997) (emphasis added); see also, *United States v. Zolin,* 491 U.S. 554, 563 n. 7, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989) ("The quantum of proof [probable cause or prima facie] needed to establish admissibility ... remains [ ] subject to question."); *In re Omnicom Group, Inc. Sec. Litig.,* 233 F.R.D. 400, 406–09 (S.D.N.Y.2006) (discussing the required showing). That is, the particular communication or document in issue "itself" must be **"in furtherance** of a contemplated or ongoing criminal or fraudulent conduct." *In re Richard Roe,* 68 F.3d at 40–41 (emphasis added); *see also In re Richard Roe,* 168 F.3d 69, 71 (2d Cir.1999) (the document was intended in some way to facilitate or to conceal the criminal activity); *In re Omnicom Group, Inc. Sec. Litig.,* 233 F.R.D. at 404 ("The pertinent intent is that of the client, not the attorney."). Somehow or some way, the advice sought must be used or contemplated to be used to complete an illegal activity or perpetrate a fraudulent scheme. *In re Int'l Sys. and Controls Corp. Sec. Litig.,* 693 F.2d 1235, 1242 (5th Cir.1982). In assessing whether the Plaintiffs have demonstrated probable cause, the Court may review, *in camera,* the privileged document and ascertain if it supports the view that it was being used at the time of its drafting to commit or conceal a fraud or a crime. *United States v. Zolin,* 491 U.S. at 572, 109 S.Ct. 2619; *Boss Mfg. Co. v. Hugo Boss AG,* 1999 WL 47324 (S.D.N.Y. Feb.1, 1999); *see also Clark v. United States,* 289 U.S. at 16, 53 S.Ct. 465 ("A privilege ... vanish[es] when abuse is shown to the *satisfaction of the judge* ....") (emphasis added).

### 1. *Interfor Report*

■ The record indicates that the investigative firm, Interfor, performed two investigative acts which are the targets of Ross' Subpoena. O'Hara joins Ross in asking the Court to utilize the crime/fraud exception to pierce either the attorney-client privilege or work product documents.

First, we have determined that the Interfor Report is not protected by the attorney-client privilege but rather by the work product doctrine.[25] However, this may be a distinction without a difference since the applicability of the crime/fraud exception remains the same for both. *In re Richard Roe*, 68 F.3d at 41, n. 2; *see also In re John Doe Corp.*, 675 F.2d at 492. Since NXIVM had commenced a lawsuit against Ross in the fall of 2003, there was pending litigation at the time Interfor was hired to investigate Ross and when it issued the Status Report, dated November 23, 2004. By gathering information about Ross, which may create strategies for NXIVM in prosecuting its claims against him, the Report was prepared for litigation purposes. It appears that Interfor may have even undertaken its investigation before a written retainer was signed but, at the direction of his clients, O'Hara signed a retainer agreement with Interfor to investigate the Kristen Snyder matter and eventually Ross. Investigations of litigants are generally commonplace and often viewed as work product. What raised eyebrows for Ross and O'Hara about this Report, and is the linchpin of their argument for piercing the privileges, is the improper and probably illegal manner in which Interfor collected data on Ross' banking and telephone information.[26] Within this Report, a number of privacy breaches are divulged, including several of Ross' banking transactions. Federal law provides privacy protection for customer information of a financial institution and prohibits an otherwise unauthorized person or institution to obtain this information by false pretenses. 15 U.S.C. § 6821(a) & (b).[27] Gathering and then listing personal banking transactions, no matter how few, would appear to a reasonably prudent person to be a violation of federal law. It would then appear that Ross and O'Hara may have met their burden under the crime/fraud exception, but, their understanding of the law is misplaced or incomplete.

Ross and O'Hara have assiduously shown, and may have met their burden of reasonable cause to believe that a crime of fraud has been committed by Interfor and possibly its

---

**25.** In the context of the Interfor Report being work product, NXIVM intimates that this Report is opinion and not fact work product, which would require a higher burden to pierce the confidentiality shield. *See supra* Section III.C.2. We have reviewed the Report and conclude that this is not an opinion work product but a fact work product.

**26.** The collection of Ross' medical records would be included in this list since it would have violated H.I.P.A.A., 45 C.F.R. §§ 160 *et seq.* However, NXIVM avers that Ross' medical records were already posted on a website *www.religiousfreedomwatch.org. See* Dkt. No. 62, Ex. B (report on Ross on the internet). *Being so posted* on the Internet ameliorates any complaint of violating H.I.P.A.A by NXIVM. In any event, the H.I.P.A.A. claim could only be asserted against a medical provider.

**27.** This banking statute reads, in part, as follows: It shall be a violation of this subchapter for any person to obtain or attempt to obtain, or cause to be disclosed or attempt to cause to be disclosed to any person, customer information of a financial institution relating to another person—

(1) by making a false, fictitious, or fraudulent statement or representation to an officer, employee, or agent of a financial institution;
(2) by making a false, fictitious, or fraudulent statement or representation to a customer of a financial institution; or
(3) by providing any document to an officer, employee, or agent of a financial institution, knowing that the document is forged, counterfeit, lost, or stolen, was fraudulently obtained, or contains a false, fictitious, or fraudulent statement or representation.
(b) Prohibition on solicitation of a person to obtain customer information from financial institution under false pretenses.
It shall be a violation of this subchapter to request a person to obtain customer information of a financial institution, knowing that the person will obtain, or attempt to obtain, the information from the institution in any manner described in subsection (a) of this section.
15 U.S.C. § 6821(a) & (b).
The statutes also carves out some exceptions but none are applicable to our facts. *See* 15 U.S.C § 6821(c)-(g).

principals who may have authorized, sought, ratified or sanctioned the collection of such personal data by any means necessary in order to invoke this exception. But what is lacking in their demonstration is the second prong of the crime/fraud exception: "that the attorney-client communication was intended to facilitate or conceal the misconduct." *United States v. Jacobs,* 117 F.3d at 87; *In re Omnicom Group, Inc. Sec. Litig.,* 233 F.R.D. at 406–09 (discussing the required showing). The Second Circuit has pellucidly stated that this exception does not apply "simply because the privileged communication would provide an adversary with evidence of a crime or fraud, [and], if it did the [attorney-client] privilege would be virtually worthless." *In re Richard Roe,* 68 F.3d at 40–41. Rather, the exception applies when the particular communication or document in issue "itself" is used **"in furtherance** of a contemplated or ongoing criminal or fraudulent conduct." *Id.; see also In re Richard Roe,* 168 F.3d at 71 (emphasis added) (the document was intended in some way to facilitate or to conceal the criminal activity). Stated another way, the exception concerns "not prior wrong doing but future wrong doing." *United States v. Zolin,* 491 U.S. at 563, 109 S.Ct. 2619; *In re Int'l Sys. and Controls Corp. Sec. Litig.,* 693 F.2d at 1242 (during "the course of planning future crime").

Yes, the Interfor Report may describe criminal conduct but Ross and O'Hara fail to show how this report was used or contemplated to be used to complete an illegal activity or perpetrate a fraudulent scheme. O'Hara postulates that the Interfor Report is the preliminary step toward the sting operation. Yet, even though there is a casual connection between the Report and the sting operation, yet his postulation does not rise to the level of reasonable cause to believe. These events may have occurred *seriatim,* the Interfor Report which only provides information, albeit illegally obtained, was not used to facilitate or perpetrate the sting. Ross and O'Hara fail to show how this Report was used to defraud Ross. They have thus failed to meet their burden at least as to the Interfor Report under the crime/fraud exception, and the work product protection still prevails.

## 2. Sting Operation

■■ The details of the sting, from its inception to its conclusion, will suffer a different fate than the Interfor Report. Succinctly, just to reiterate, in the later part of November 2004, NXIVM and Interfor concocted a plan to get Ross to talk about his defense in *NXIVM v. Ross et al.* and his intervention investigations which may have included NXIVM. *See supra* Section I.B. Unaware of the scheme, Ross met, at Interfor's Office, with Juval Aviv, President of Interfor, Anna Moody, Aviv's assistant, and an actress who portrayed a distraught mother who believed her daughter was locked in the nefarious clutches of NXIVM and in need of an intervention specialist much like Ross. The investigative team's sole purpose was to discover Ross' investigative techniques, whether he had other NXIVM/ESP clients, and ascertain what he knew and felt about NXIVM; they asked him a lot of questions along these lines. They continued this connivance by retaining Ross to intervene on behalf of this phony Zuckerman family and extended a $2,500.00 retainer to him. The plan to get Ross to conduct this intervention on a cruise ship ultimately collapsed from its own design.

There are at least two reasons for granting Ross access to the underlying facts of the sting: (1) the crime/fraud exception will pierce the attorney-client privilege during the initial planning stages of the sting; and (2) after November 24, 2004, NXIVM and Interfor were not operating under any attorney-client privilege or work product protection.

■■ After O'Hara had retained Interfor and a day prior to the release of the Ross Status Report, on November 22, 2004, Interfor and NXIVM representatives, including O'Hara, met. O'Hara made notes to himself about the various topics discussed and these notes are informative enough to illuminate the cabal's strategy to gather and collect information from Ross. On the first page of the notes are notations about the "distraught mother" scheme. But beginning on the sec-

ond page, emblazoned across the top of these notes is the phrase "Rick Ross Sting" followed by the observation that "N & H [Nolan and Heller] can't participate because they represent NXIVM/ESP against Rick Ross et al—and he's represented by counsel." Dkt. No. 68, Ex. R. Everyone should have known the parameters, and if not, at least attorney O'Hara should have known that an attorney cannot have any *ex parte* contact with an adversary who is represented by counsel. N.Y. COMP. CODES R. & REGS. tit. 22, § 1200.35.[28] Any improper contact of this nature or naked disregard of a Discipline Rule may fall within the crime/fraud exception. A plan to ensnare Ross into divulging intimate litigation or business strategies by deceit may constitute a fraud.[29] A fraud is defined as "a knowing misrepresentation of the truth or concealment of a material fact to induce another to act to his or her detriment." *In re Enron Corp.*, 349 B.R. 115, 127–28 (Bkrtcy.S.D.N.Y.2006) (citing BLACK'S LAW DICTIONARY 670 (7th ed.1999)). However, the crime/fraud exception is not relegated solely to crimes, criminal fraud, or common law

fraud. "At a minimum, the attorney-client privilege does not protect communications in furtherance of an intentional tort that undermines the adversary system itself." *Madanes v. Madanes* 199 F.R.D. 135, 149 (S.D.N.Y.2001). Without providing specifics, however, the Second Circuit clearly noted that "advice in furtherance of a fraudulent or **unlawful goal** cannot be considered 'sound.' Rather advice in furtherance of such goals is socially perverse, and the client's communication seeking such advice are not worthy of protection." *In re Grand Jury Subpoena,* 731 F.2d 1032, 1038 (2d Cir.1984) (emphasis added).[30] *In Wachtel v. Guardian Life Ins. Co.,* 239 F.R.D. 376 (D.N.J.2006), the District Court was called upon to determine whether Guardian Life had intentionally used outdated information to calculate usual, customary and reasonable charges for out-of network medical services upon the advice of counsel to misled the New Jersey Department of Banking and Insurance, and also used counsel to delay discovery. The consequence of such conduct led to the designation of a

**28.** It is a seminal rule of law that an attorney should not have any contact with a litigant who is represented by counsel. Discipline Rule 7–104(A)(1) emphatically states that

during the course of the representation of a client a lawyer shall not: (1) [c]ommunicate or cause another to communicate on the subject of the representation with a party the lawyer knows to be represented by a lawyer in that matter unless the lawyer has prior consent of the lawyer representing such other party or is authorized by law to do so.

N.Y.COMP. CODES R. & REGS. tit. 22, § 1200.35(A)(1).

This Discipline Rule explicitly forbids any and all unauthorized contact with an adversarial litigant, whether directly or indirectly. That means you cannot hire an investigator to do what a lawyer cannot.

**29.** Magistrate Judge Falk arrived at the same conclusion, and not by such a dissimilar finding, that this sting operation was "improper, well beyond the rules of litigation, the rules of the game." NJ Tr. at p. 107; *see also* NJ Tr. at pp. 102–112. Judge Falk did not confront the issue of whether such conduct "vitiate[d] the attorney-client privilege and work product doctrine ... but the court's inclination is that a *prima facie* showing ... has been made." *Id.* at 108. The New Jersey Court continued to state in support of its *in camera* review of the documents that a "flagrant violation of the rules of professional conduct could be sufficient to pierce the attor-

ney/client work product doctrine." *Id.* at p. 109. Lastly, Judge Falk found on their record that Ross has "presented a sufficient basis to conclude that a common law fraud has occurred." *Id.* at p. 111.

**30.** Although there is no long list of specific acts, the Second Circuit, nonetheless, has provided some examples as to what may be considered within a crime/fraud exception:

For example, one may violate the antitrust laws by bringing baseless litigation intended to delay entry into a market by a competitor. *See Landmarks Holding Corp. v. Bermant,* 664 F.2d 891, 895–97 (2d Cir.1981). If the litigation objectively lacked a factual or legal basis, some communications or work product generated in the course of such litigation might, after a rigorous *in camera* review by a court for relevance, fall within the crime-fraud exception. Thus, a client's directing an attorney to make large numbers of motions solely for purposes of delay would be discoverable. Similarly, where a party suborns perjury by a witness to bolster a claim or defense, communications or work product relating to that witness might also be discoverable. *See In re John Doe, Inc.,* 13 F.3d at 635, 637–38. We do not probe these issues beyond setting out these examples because the documents sought here clearly do not fall within the crime-fraud exception.

*In re Richard Roe, Inc.,* 168 F.3d 69, 72 (2d Cir.1999).

special master to determine which documents would be subject to the crime/fraud exception since the Guardian Life's actions undermined, obstructed and subverted the adversary system. 239 F.R.D. 376, 378 & n. 1; *see also Rambus, Inc. v. Infineon Tech. AG*, 220 F.R.D. 264, 283 (E.D.Va.2004) (finding that communication and work product used in furtherance of the spoilation of evidence fell within the crime/fraud exception even though it is neither a crime, fraud or tort but rather was not advancing the observance of the law and counseling misconduct).

NXIVM and others wanted to focus on Ross' role in the Kristen Snyder case and were concerned that if he was successful on the *certiorari* petition to the United States Supreme Court he would publish everything, which presumably may include his perspective on Snyder's death. In the final analysis, it was decided that "Juval [Interfor] [would] ask RR [Ross] about: (1) how did [he] get the 2nd Circuit to rule in [his] favor; (2) [w]hat [he was] going to do if the Supreme Court rules in [his] favor; (3) [h]ow many other ESP members come from wealthy families; and (5) [w]ho else from ESP has RR [Ross] worked with." Dkt. No. 68, Ex. R, at p. 4. Conspicuously absent from this memo and O'Hara's affidavit is his objection to this scheme. Since he was present during this discussion and knew or should have known that such plan was at least ethically improper, his acquiescence or the paucity of prose in his note echoes loud and can be reasonably construed to be an endorsement of the scheme and upon counselor's advice. Thus his sublime concurrence can also be viewed as being used in furtherance of a fraud or misconduct and, in this case, the subversion of an adversary's attorney-client rights that undermines the integrity of the adversary system. This is the only mechanism or attorney supervision upon which NXIVM can lay claim that the facts and related conversations concerning the sting operation can even be considered privileged.. *See also* Dkt. No. 68, Ex. (March 11, 2005 Termination Memo, "during the course of providing legal services to you …"). Whether or not O'Hara gave any advice at this meeting, the communication should not be protected under any circumstance. Hence, the exception shall pierce all of the communications leading up to and including the November 22nd sting operation discussion.

After receiving the Interfor Report on November 23rd, an outraged O'Hara wrote to Raniere and Salzman first disclaiming any personal knowledge of Interfor tactics of peering into Ross' statutorily protected documents and then divorcing himself from the entire sting operation:

> In this regard, it is imperative that you— or Kristin [Keefe]—immediately direct INTERFOR to cease and desist any such activities … At this point, I am *not* willing to have INTERFOR continue to undertake activities on behalf of NXIVM/ESP through TOGA … (This specifically includes, but is not limited to, the "Sting Operation" that Keith [Raniere] has proposed having INTERFOR undertake with respect to Mr. Ross.).

Dkt. No. 68, Ex. Q.

O'Hara asseverates that he had no further contact with Interfor after his November 24th missive to NXIVM and did not participate any further in the scam of Ross. At most, his relatively limited contact with Interfor dealt with receiving and then forwarding Interfor's bills onto NXIVM. Within a matter of two months, in January 2005, O'Hara advised NXIVM that he was severing his professional relationship with it, which was confirmed in writing in March 2005. *See generally* Dkt. No. 68, O'Hara Decl. Without counsel's advice or direction, and, in derogation of his instruction to cease such activity, the record implicitly indicates that Interfor and NXIVM were acting on a high wire with this sting operation without the protected net afforded them by the attorney-client relationship, *a fortiori*, there were no attorney-client communications involved. Moreover, since O'Hara, Nolan and Heller, or any other attorney or litigator did not solicit this type of investigation for this pending litigation, as they should not and could not,[31] there can be

---

31. The Discipline Rules are replete with instructions forbidding an attorney from participating in the nefarious machinations of her client:

no work product doctrine either. In this respect, NXIVM has failed to show, which is its burden, that this "sting operation/investigation" is guarded by the attorney-client privilege or the work product doctrine.[32]

■ As we now know, O'Hara has exposed the sting operation not only to Ross but to the press. The news media notwithstanding, whether upon the benefit of hindsight, overt concern, or personal advantage, O'Hara may have had a duty to disclose the sting operation to someone. An attorney's duty of confidentiality does not extend to a client's announcement of a plan to engage in criminal conduct, or, as in this case, breaching an inviolate Discipline Rule. *Nix v. Whiteside*, 475 U.S. 157, 174, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986) ("[T]he responsibility of an ethical lawyer ... is essentially the same whether the client announces an intention to bribe or threaten witnesses or jurors or to commit or procure perjury.... No system of justice worthy of the name can tolerate a lesser standard."); *People v. Andrades*, 4 N.Y.3d 355, 361–62, 795 N.Y.S.2d 497, 828 N.E.2d 599 (2005) (ruling that an attorney "could have properly made such a disclosure [of the intent to provide perjured testimony] since a client's intent to commit a crime is not a protected confidence or secret."); *People v. DePallo*, 96 N.Y.2d 437, 443, 729 N.Y.S.2d 649, 754 N.E.2d 751 (2001) ("The intent to commit a crime is not protected confidence or secret."); *In re White*, 42 B.R. 494, 499 (Bankr.E.D.N.Y.1984) ("Communications in the aid of fraud are not protected by the attorney-client privilege."). Even though NXIVM and Interfor's fraud upon Ross may not rise to the level of a crime or a civil fraud, for strong public policy reasons, a blatant subterfuge of the adversary system should not find a safe haven within the fervent clutches of the attorney-client privilege.

In this regard, Discipline Rule 7–102(B)(1) states that "a lawyer who receives information clearly establishing that

> [t]he client has, in the course of the representation, perpetrated a fraud upon a person or tribunal shall promptly call upon the client to rectify the same, and if the client refuses or is unable to do so, the lawyers shall reveal the fraud to the affected person or tribunal, except when the information is protected as a confidence or secret."

N.Y. COMP. R. & REGS. tit. § 1200.33(B)(1) [DR 7–102(B)(1) ]; *see also* § 1200.19(C)(3) [DR 4–101(C)(3) ] (An attorney can reveal confidences if the intention of the client is to commit a crime).

Upon the record presented, O'Hara sent a memorandum directly NXIVM to cease and desist in the further investigation, which included the sting operation. NXIVM and Interfor proceeded forward, nonetheless. No matter the construction, the sting operation discussions and acts are not protected communications nor work product. Abiding by the mandates of DR 7–102(B)(1), O'Hara should have advised Ross, an affected person, much earlier than a year after the events. N.Y. COMP. CODES R & REGS. tit. 22, § 1200.33(b)(1).

For all of these reasons, the sting operation is not protected and hence subject to disclosure. The crime/fraud exception has not been established in regards to the Interfor Report however. We now must address the issues of waivers.

*E. Waiver of Attorney–Client Privilege and Work Product Doctrine*

There are circumstances, and permutations thereof, that cause waivers upon waiv-

---

A lawyer may refuse to aid or participate in conduct that the lawyer believes to be unlawful, even though there is some support for an argument that the conduct is legal.
N.Y.COMP. CODES. R. & REGS. tit., 22, § 1200.32(B)(2).

\* \* \* \* \* \*

A lawyer shall not counsel or assist the client in conduct that the lawyers knows to be illegal or fraudulent [or] knowingly engage in other illegal conduct or conduct contrary to a Discipline Rule.

N.Y.COMP. CODES R. & REGS. tit. 22, § 1200.33(A)(7) & (8).

32. Equally troubling, though we do not need to dwell upon these circumstances, is the argument that O'Hara may have found out the facts of the sting from a third party. If O'Hara came into those facts from a third party, obviously there is no attorney-client privilege. And, if a NXIVM employee or agent disclosed the facts to him after his withdrawal as counsel in January and March 2005, it was not done with the intent of securing legal advice.

138

ers to these less than sacrosanct rules. Cynthia B. Feagan, Comment, *Issues of Waiver In Multiple–Party Litigation: The Attorney–Client Privilege and the Work Product Doctrine*, 61 UMKC L. REV. 757 (1993); Edna Selan Epstein, *The Attorney–Client Privilege and the Work–Product Doctrine*, (4th ed.2001). Considering that the attorney-client privilege protects communications and the work product doctrine protects tangible items which may contain strategies, impressions, and attorney's opinions, both the privilege and the doctrine may be waived in various ways including sharing such documents with a third party. *In re Pfohl Bros. Landfill Litig.*, 175 F.R.D. 13, 22–28 (W.D.N.Y. 1997) (survey of the various types of implicit and explicit waivers); *see also* Feagan, Comment, *Issues of Waiver in Multiple–Party Litigation*, 61 UMKC L. REV. at 775–77. We need not now address all of the potential waivers and exceptions to the attorney-client privilege and the work product doctrine, but it is necessary in the context of this case to first draw upon those waivers which invariably cause lawyers the greatest angst, and may be problematic in this case. *See In re Pfohl Bros. Landfill Litig.*, 175 F.R.D. at 22–26.

### 1. Third Party Waiver

The waiver to which we speak is whether the client's communication(s) or the legal advice given was shared, in some form or fashion, with a third party. A waiver such as this may be done explicitly or implicitly, or rather, intentionally or inadvertently. 6 JAMES WM. MOORE ET AL, MOORE'S FEDERAL PRACTICE § 26.49[5] (3d ed.2005); *In re Pfohl Bros. Landfill Litig.*, 175 F.R.D. at 24–26. Obviously, when communications between a party and her attorney occur in the presence of a third party, the privilege may be waived. *United States v. Am. Tel. and Tel. Co.*, 642 F.2d 1285, 1298–99 (D.C.Cir.1980). Yet, a disclosure to a third party does not waive the privilege unless such disclosure is inconsistent with the "maintenance of secrecy" and if the disclosure "substantially increases the possibility of an opposing party obtaining the information." *GAF Corp. v. Eastman Kodak Co.*, 85 F.R.D. 46, 51–52 (S.D.N.Y.1979), *abrogated on other grounds by In re Stein-*

*hardt Partners, L.P.*, 9 F.3d 230, 233 (2d Cir.1993). For example, an exemption from the waiver accrues if such communications are shared with an agent of the attorney, which may include investigators and accountants retained to assist the attorney in rendering legal advice and instruction. *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir.1989) (accountant); *United States v. McPartlin*, 595 F.2d 1321, 1336–37 (7th Cir. 1979) (investigator); *United States v. Kovel*, 296 F.2d 918, 921–24 (2d Cir.1961) (disclosures to an accountant does not waive attorney-client privilege).

As noted above, the work product doctrine is not absolute either. Such protection, like any other privilege, can be waived and the determination of such a waiver depends on the circumstances. *United States v. Nobles*, 422 U.S. at 239–40, 95 S.Ct. 2160. In fact, in most respects, the discussion of a third party waiver is virtually the same for both the attorney-client privilege and the work product doctrine. A voluntary disclosure of work product, for some or any inexplicable benefit, to a third party, especially if the party is an adversary, may waive the immunity. *In re Steinhardt Partners, L.P.*, 9 F.3d 230, 234–37 (2d Cir.1993); *see also In re Grand Jury Proceedings*, 219 F.3d at 191; *Strougo v. BEA Associates*, 199 F.R.D. at 521–22. "Once a party allows an adversary to share in an otherwise privileged document," "the need for the privilege disappears," and may disappear forever, even as to different and subsequent litigators. *In re Steinhardt Partners*, 9 F.3d at 235 (citing *United States v. Nobles*, 422 U.S. at 239, 95 S.Ct. 2160). As an illustration, when a party makes a strategic decision, no matter how broad and sweeping or limited, to disclose privileged information, a court can find an implied waiver. *In re Grand Jury Proceedings*, 219 F.3d at 190–92. Moreover, a party cannot partially disclose a privileged document nor selectively waive the privilege and then expect it to remain a shield. *Id.* at 191. However, there is no *per se* rule that all voluntary disclosures constitute a waiver of the work product doctrine because there is no way the court can anticipate all of the situations when and how such disclosure is

required. *In re Steinhardt Partners,* 9 F.3d at 236 (*i.e.,* privilege not waived if shared with someone of common interest). There are times when a waiver can be broad and other times when it has to be narrowly construed. Each case must be judged on its own circumstances and merits. *See Strougo v. BEA Associates,* 199 F.R.D. at 521–22. We will concentrate our analysis of waiver vis-a-vis the Interfor Report since it is the focus of two litigations.

### 2. Analysis of Raniere

 Ross argues that by sharing the Interfor Report and the sting operation with Keith Raniere NXIVM vitiated the attorney-client privilege and/or work product doctrine. Raniere is not a party to the Ross litigation, a paid employee of NXIVM, and does not have an official title or designation with NXIVM, even though he claims to be the founder of Rational Inquiry ™, the business platform for its ESP Program. NXIVM refers to Raniere as a full-time, unpaid "volunteer" advising it on all aspects of its business. Ross contends "given [Raniere's] wholesale lack of any relationship with NXIVM, presentation of any confidential information to him should be deemed a waiver." However, despite the euphemisms, Raniere is more than a volunteer or titular advisor of NXIVM, he is the supreme authority of all things NXIVM. *See* Dkt. No. 68, Exs. E (*Forbes* article) & J (brochure for the "Vanguard Week"); *see generally* O'Hara Decl. Holding such a lofty role, lack of remuneration and titles notwithstanding, he would be privy to all of the matters, including litigation, that all of NXIVM's employees and agents would know, and would be consulted regularly about them. In fact, as reflected in the record, O'Hara spoke to Raniere directly and even addressed correspondence and memoranda to his attention. On occasion, O'Hara deferred to Raniere. Raniere is not some mere or informal advisor, he is the quintessential insider of this business on every aspect confronting it. Any disclosure to Raniere was consistent with maintaining secrecy and at the time the Interfor Report was shared with him it was not meant to get into the hands of an adversary, and hence no waiver of the protection. All of this informa-

tion was being shared with him for his benefit as well. Thus, the lack of title or being relegated to a volunteer status does not in and of themselves offend the protection afforded the documents nor create a waiver.

Likewise, O'Hara suggests that there has been a third-party waiver when communications and documents were shared with James Loperfido who is NXIVM's accountant. Dkt. No. 68, Defs.' Mem. of Law at p. 16. We agree with O'Hara that if the documents were merely shared with Loperfido without some nexus to an attorney giving advice, no privilege would attach and thus would constitute a waiver if there was a pre-existing privilege. *United States v. Adlman I,* 68 F.3d at 1495 (citing *United States v. Arthur Young Co.,* 465 U.S. 805, 817, 104 S.Ct. 1495, 79 L.Ed.2d 826 (1984)); *United States v. Bein,* 728 F.2d 107, 112 (2d Cir.1984). Conversely, an exemption from the waiver accrues if such communications are shared with an agent of the attorney, which may include investigators and accountants retained to assist the attorney in rendering legal advice and instruction. *United States v. Schwimmer,* 892 F.2d 237, 243 (2d Cir.1989) (accountant); *United States v. McPartlin,* 595 F.2d 1321, 1336–37 (7th Cir.1979) (investigator); *United States v. Kovel,* 296 F.2d 918, 921–24 (2d Cir.1961) (disclosures to an accountant does not waive attorney-client privilege).

The record as to whether there is a waiver in terms of Loperfido's receipt of any document is not fully developed by O'Hara who has the burden of establishing the waiver. Neither O'Hara nor any other party for that matter, has explained Loperfido's role in this matter and placed it in context for the Court. We do not know if Loperfido received any documents directly from O'Hara or NXIVM representatives. We do not know, at least from this record, if Loperfido was assisting NXIVM's lawyers to understand NXIVM's records. In this respect, O'Hara has failed to meet his burden on this issue.

### 3. Analysis of Sitrick Company

 We must now turn to whether a third-party waiver occurred when the Inter-

for Report was shared with the public relations firm Sitrick Company on or about November 24, 2004.

After being the subject of an unflattering expose in *Forbes* magazine, at the same time litigation against Ross was raging with the matter on appeal to the Second Circuit and ultimately going to the United States Supreme Court, NXIVM hired Sitrick primarily to combat negative press and create a long term and short term public relations strategy and hopefully generate positive press. Consistent with most of NXIVM's outside contractors, O'Hara entered into a written retainer with Sitrick which stated in part that Sitrick would provide advice and public relations in connection with various legal concerns. Inserted into this agreement are boilerplate terms that "all communications, correspondence, instruments and writings between **Sitrick and Attorney** shall be deemed to constitute attorney work-product and otherwise protected by the attorney-client privilege." Dkt. No. 72, Ex. B, at p. 2 (emphasis added). We must reiterate again, at this juncture, that blanket confidentiality clauses invoking the attorney-client privilege and work product doctrine do not necessarily make it so. It is the facts, circumstances, and purpose that determine whether a communication with an attorney will deserve protection and its the anticipation of litigation that will convert a document into legal work product. The record indicates that Sitrick commenced rendering public relations services to NXIVM from October 2004, and possibly continues to this day. Dkt. No. 72, Ex. B (Sitrick's billing).

Even though O'Hara signed this retainer agreement with Sitrick, he avers that he had very limited contact with Sitrick and may have participated in one conference with the public relations firm on or about November 3, 2004. Dkt. No. 72, O'Hara Decl., at ¶¶ 7 & 8, Ex. B. Nolan and Heller, the law firm representing NXIVM in its lawsuit against Ross, was present during this same meeting, but, there is no other recording indicating that Sitrick had any further conferences with this or any other law firm who may be been representing NXIVM. *See* Dkt. No. 72, Ex. B.

O'Hara disclaims that he neither provided nor received any material from Sitrick. He disavows providing the Interfor Report on Ross to Sitrick especially in light of the fact that he has so vociferously disowned any involvement or association with it. The likely source of the Interfor Report was Interfor itself. Sitrick's detailed billing records indicate that it mostly had contact with Keefe, Salzman, and Interfor, pertaining predominately to NXIVM's public relations issues. True, Sitrick reviewed legal documents, pleadings, judicial decisions and the like, and participated in strategy discussions about Ross and the litigation, but the predominate services Sitrick furnished were monitoring relevant news coverage, collecting information on Ross and others, vetting and pitching news stories to reporters, researching and locating friendly reporters, capitalizing on positive developments, creating a press kit, and otherwise formulating a public relation strategy.

O'Hara's hiring of Sitrick was a facade and not for the purpose of helping O'Hara provide legal advice to NXIVM but to give cover to communications between NXIVM, Interfor, and Sitrick. O'Hara never used Sitrick's services and as far as the record reveals neither did any other law firm working on behalf of NXIVM. Only NXIVM's principles availed themselves of Sitrick's professional services. O'Hara and his law firm were used as an intermediaries in name only—a mule—with the anticipated effect of concealing all conversations and all actions under the cloak of an attorney-client privilege or work product, without any particular professional involvement on his part. O'Hara's involvement was nothing more than a tool to achieve secrecy, not to give legal advice. NXIVM unwittingly cites *Calvin Klein Trademark Trust v. Wachner*, 198 F.R.D. 53 (S.D.N.Y. 2000) and *In re Subpoenas Dated March 24, 2003*, 265 F.Supp.2d 321 (S.D.N.Y.2003) in support of their proposition that the work product characteristic of the Interfor Report persisted in Sitrick's hands. Rather than rendering that support, these precedents countermine its contention.

Even the most proficient and prolific attorneys have to resort to consultation with oth-

ers in order to render full and complete legal services to their clients. That is how the legal world now turns. As a harbinger of things to come, such as media firms assisting attorneys in mega-litigation cases with economic, political, and social ramifications for their clients, the Second Circuit considered the debate whether the attorney-client privilege would include communication with non-lawyers, such as accountants and public relations firms who do not have a similar privilege, in *United States v. Kovel*, 296 F.2d 918 (2d Cir.1961). There, an attorney had hired an accountant to help him interpret her client's financial circumstances in order for the lawyers to render full and accurate advice. Noting that accounting concepts may be analogous to a foreign language for most lawyers, the presence of the accountant to help clarify certain complicated factors outside the lawyer's bailiwick should not defeat the attorney-client privilege. The critical factor that vivifies the privilege under these circumstances is that the "communication be made in confidence for the purpose of obtaining legal advice from the lawyer.... If what is sought is not legal advice but only accounting services ... or if the advice sought is the accountant's rather than the lawyer's, no privilege exists." *Id.* at 922. Thus, the extension of the privilege to non-lawyer's communication is to be narrowly construed. If the purpose of the "third party's participation is to improve the comprehension of the communication between attorney and client," then the privilege will prevail. *United States v. Ackert*, 169 F.3d 136, 139 (2d Cir.1999) (ruling that the communication "between an attorney and a third party does not become shielded by the attorney-client privilege solely because the communication proves important to the attorney's ability to represent the client").

This legal notion that even a public relations firm must serve as some sort of "translator," much like the accountant in *Kovel*, was visited in *Calvin Klein Trademark Trust*, 198 F.R.D. 53. Much like the services being rendered here, the public relations firm in *Calvin Klein* was found to have simply provided ordinary public relations advice and assisted counsel in "assessing the probable public reaction to various strategic alter-natives, as opposed to enabling counsel to understand aspects of the client's own communications that could otherwise be appreciated in the rendering of legal advice." 189 F.R.D. at 54–55 (citing *United States v. Ackert*, 169 F.3d at 139). Thus, no attorney client privilege was extended to its communications with either the client or the firm. *Id.* at 53–55. A similar result occurred in *Haugh v. Schroder Inv. Mgmt. North Am. Inc.*, 2003 WL 21998674 (S.D.N.Y. Aug.25, 2003), wherein the court found that the record did not show the public relations specialist performed anything other than standard public relations services for the plaintiff, and noting that a media campaign is not a legal strategy. *See also De Beers LV Trademark Ltd. v. De Beers Diamond Syndicate Inc.*, 2006 WL 357825 (S.D.N.Y. Feb.15, 2006).

NXIVM places great reliance upon *In re Subpoenas*, 265 F.Supp.2d 321, in support of its claim that the Interfor Report is cloaked by a privilege. *In re Subpoenas* deviates slightly from the analogous interpreter test laid out by the Second Circuit and other district courts within the Circuit and resolves for itself the ultimate issue that if an attorney efforts to influence public opinion on behalf of her client are services, "then the rendition of which also should be facilitated by applying the privilege to relevant communications which have this as their object." *Id.* at 326. That court proceeded to establish elements to help distinguish the consultant's ordinary public relations services from other frank discussions of facts and strategies between lawyer and consultant which would earn protection. *Id.* at 330–31. Notwithstanding the cogent reasoning that incorporates modern realities and intentions in addressing how profile cases are handled in the courtroom and the court of public opinion, we are not prepared to make that same deviation from the narrowly tailored test of *Kovel* and *Ackert*.

For several critical reasons, which we alluded to above, we are also not prepared to apply to our case the *Calvin Klein Trademark* determination that work product protection is not waived when "the attorney provides the work product to the public relations consultant whom he has hired and who

maintains the attorney's work product in confidence ...[especially] if ... the public relations firm needs to know the attorney's strategy in order to advise as to the public relations[.]" 198 F.R.D. at 55. In a general context, we may agree. Sharing work product with a third party with the intent of maintaining its secrecy and preventing it from falling into the hands of the adversary is a generally accepted principle. But this is not a bright line rule and there are just too many situations for such a strict rule to exist. The waiver of the doctrine depends upon the circumstances and each case is judged on its own facts. *United States v. Nobles*, 422 U.S. at 239–42, 95 S.Ct. 2160. In a case like ours, a work product document must lose its essential character when it is given even to a friendly third party who advances it for purposes other than the anticipation of litigation.

First, even utilizing *Calvin Klein Trademark* as a guide, Sitrick did not receive the Interfor Report from an attorney and there is no evidence in the record that Sirick consulted with any of NXIVM's lawyers about the contents of the Report and its relative significance to the *Ross* litigation. Remember Sitrick's agreement was with O'Hara, as an agent of NXIVM, and also remember that he was not privy to the on-going communications between his client and Sitrick. If we were to rely on the Terms of Engagement, it would be the communications between Sitrick and O'Hara that arguably may garner work product status, and not the communications with others. O'Hara states that there were no such communications between him and Sitrick. O'Hara gave no direction nor instruction nor sought any translation from Sitrick to help him aid other lawyers to advise NXIVM. Second, Sitrick's relationship with O'Hara was nothing short of smoke and mirrors. Sitrick was hired to clean up NXIVM's damaged image and the litigation. O'Hara's component was just camouflage to mask the overall nature of their conversations. Sitrick used this Report to further their research of Ross so that they could pander the sensitive yet damaging information to sympathetic reporters. The underlying and transparent intent was to use the contents of the Interfor Report to promulgate certain images of both Ross and

NXIVM or deflect further media intrusion by Ross and others. *See* Dkt. No. 72, Ex. B. The retainer agreement and the relationship are nothing short of a pretense crafted by clever people to attempt what they could not ordinarily do under their own auspices. *See* Dkt. No. 72, Ex. A (Salzman email about signing the retainer agreement so that attorney-client privilege is established). It is hypocritical to claim that a document is confidential one moment and then share such documents with a host of others to be used for something other than litigation. Even *Calvin Klein Trademark* initially observed that "as a general matter public relation advice, even if it bears on anticipated litigation, falls outside the ambit of protection of the so-called work product ... because the purpose of the rule is to provide a zone of privacy for strategizing about the conduct of litigation itself, not for strategizing about the effects of the litigation on the client's customers, the media, or on the public generally." 198 F.R.D. at 55.

Delivering the Interfor Report to Sitrick was a deliberate, affirmative and selective strategic decision to disclose this information for another benefit other than aiding the lawyer pitched in the battle of litigation. *In re Grand Jury Proceedings*, 219 F.3d 175, 192 (2d Cir.2000). The benefit was for control of the airwaves and print media, which NXIVM hoped to profit. Although it was shared with the expectation of secrecy until revealed, the longitudinal expectation was to make the content of the Report fodder for grander public discourse. A party cannot selectively share a work product and then expect it to remain as a shield. Just as the attorney-client privilege cannot be used as a shield and sword, neither can a work product document, especially one that does not include an attorney's impression, opinions, or strategies. And for all of these reasons, we find that the Interfor Report is now stripped of its work product protection.

In a footnote reference, Ross raises an at issue waiver as being applicable in this case. Dkt. No. 67, Intervenor's Mem. of Law at p. 37, n. 27. We need not address the at issue waiver because the record is not fully developed in any manner. Placing the discussion

in a footnote is a reflection of the underdevelopment of the record on this issue. However, we have looked at the Complaint in this case and we are unable to see such an at issue waiver at this time. This finding does not necessarily preclude a finding of an at issue waiver in District Court of New Jersey. Clearly, it should be left to the New Jersey District Court to determine if there exists an at issue waiver in the case before it.

### F. Discovery for the Purpose of Supporting Ross' Counterclaims in the New Jersey Action

Ross asks this Court to uphold his subpoena and permit discovery as to the sting operation and possibly any other misconduct directed at him. In support of this application, Ross contends that he is in substantial need of this information to prosecute his counterclaims in the New Jersey Action. Recently, Ross moved the District Court of New Jersey to permit him to amend his answer and add counterclaims based upon the facts and circumstances of the sting operation. Originally, he sought to add causes of action for harassment and invasion of privacy.[33] However, during oral arguments on this and other motions, Magistrate Judge Falk found that a common law cause of action for fraud was also apparent under these facts. After considerable analysis, Magistrate Judge Falk granted in part and denied in part Ross' motion to amend. *See* New Jersey Order, dated Jan. 10, 2007. The private invasion cause of action was allowed to stand and the harassment charged was dismissed. *See* NJ. Tr. at pp. 112–25.

In his review, Judge Falk found that Ross, the other defendants, and even the court was entitled to more information and that would entail discovery. Accordingly, he denied the NXIVM and Interfor's motion to quash the subpoena for Interfor, which was before him. NJ Tr. at pp. 99 & 111–14. We concur in Judge Falk's findings and likewise **deny** NXIVM's Motion to Quash the subpoena that

has been served upon O'Hara. The facts surrounding the sting operation are germane to Ross' counterclaims and he is entitled to explore and ascertain any admissible evidence to support his claim. In this respect, both O'Hara and Ross should be cognizant that there are still boundaries that they may not cross where the attorney-client privilege still remains viable. As we have previously noted, O'Hara wore many professional hats in consulting for NXIVM and there are times, maybe many times, when O'Hara, in fact, provided legal advice. We have already specifically identified his legal role during the period of July 1, 2004 until January 2005, which he acknowledged in his March 11, 2005 termination letter. So Ross and O'Hara should not conclude that this Decision and Order has opened the corral doors to allow that which may be protected by the attorney-client privilege to be trampled. O'Hara must walk a tight rope and not reveal those confidences truly protected. He should not succumb to his personal and legal animus and unveil that which he knows may be attorney-client privilege. Yet, if there is a question about privileges, all parties should be mindful that neither the attorney-client privilege nor the work product doctrine protects factual information. If Ross limits his inquires to the Interfor Report and the sting operation, he and O'Hara should not open Pandora's box.

Conversely, by granting Ross the right to subpoena O'Hara for a deposition, we are respectfully **denying**, in part, NXIVM's application for a further and all encompassing protective order that seals all communications and documents, except for those documents we have already held to be cloaked with the attorney-client privilege and our pronouncements immediately below. Furthermore, NXIVM's request is much too broad and lacks specificity and we cannot ignore that there is already a Confidentiality Stipulation/Order in place that must be honored.[34] Granted that this Court has found

---

33. These two causes of action are unknown to New York and may be distinctly common law only in New Jersey. NJ Tr. at p. 121.

34. We note that Magistrate Judge Falk denied NXIVM's motion for a sealing order but granted an umbrella protective order. New Jersey Order, dated Jan. 10, 2007; NJ Tr. at pp. 26–30 & 58–63.

that some of NXIVM's purported Protected Information has no legal protection or that legal protection has been waived. However, there may still exist more Protected Information of which this Court has not had the opportunity to review nor address. Obviously, O'Hara has had a penchant to expose sensitive information about NXIVM both publicly and privately, for whatever whim or motive, and we agree with NXIVM that, in some respect, he should be restrained. To this extent, except for the permitted discovery previously mentioned, this Court shall issue a further Protective Order that O'Hara shall not disclose any other Protected Information without seeking further approval from this Court or NXIVM pursuant to the terms of the Confidentiality Stipulation/Order, dated July 20, 2006.[35]

### G. NXIVM's Motion to Compel

NXIVM's Motion to Compel has two components: (1) return Plaintiffs' files now in the possession of O'Hara and (2) to be able to depose O'Hara for an additional day.

Plaintiffs charged that they have made several demands of O'Hara to return their original documents to them. In reference to the Motion compelling O'Hara to return these files to them in order to prevent further dissemination of Plaintiffs' Protected Information, Plaintiffs refers us to *Sage Realty Corp. v. Proskauer Rose Goetz & Mendelsohn L.L.P*, 91 N.Y.2d 30, 666 N.Y.S.2d 985, 689 N.E.2d 879 (1997). In that case, the New York Court of Appeals noted that a client has "presumptive access to the attorney's entire file on the matter" and ultimately ruled that the plaintiff was entitled to inspect and copy materials held by the attorney. *Id.* at 37, 666 N.Y.S.2d 985, 689 N.E.2d 879.

What is not clear to this Court is whether these documents are in fact original documents or documents created by O'Hara during the course of his multifarious roles. O'Hara agrees that Plaintiffs may access those files in his possession and asserts that he has indeed complied with their demands and produced copies of his files, with certain exceptions. And, if Plaintiffs have received these documents as O'Hara proffers, then on what basis do Plaintiffs believe that such disclosure is inadequate. Without more specificity, we are hard pressed to grant Plaintiffs relief. The thrust of Plaintiffs' request for return of the documents is to minimize O'Hara's distribution of them to third parties. However, this Court just granted a protective order directing O'Hara not to disclose any further Protected Information without the Court's or Plaintiffs' approval and this should be sufficient protection. Therefore, based upon this record, the Motion to return files is denied.

Next, Plaintiffs require O'Hara to produce his communications with third parties concerning NXIVM. It is uncontroverted that O'Hara has spoken with third-parties about NXIVM. We know that he has spoken to Ross, reporter Chet Hardin, and reporters from the *Albany Times Union* and *Schenectady Daily Gazette*. He may have even spoken to *Forbes Magazine*. NXIVM has pled a legal malpractice cause of action against him and through this Motion has, at least, laid the framework that O'Hara may have violated some of their confidences and some of his ethical obligations to them. In order to prosecute their claim and to determine what else O'Hara may have revealed about NXIVM, NXIVM is entitled to all of his initiated communications with third-parties from January 2005 to present. We have limited the entitlement to his initiated communications because they would certain be in violation of the Confidentiality Stipulation/Order, more likely to occur, and more easy to trace. The probability of others asking O'Hara to disclose Protected Information seems rather unlikely, slim, even remote.

---

35. This Court lacks the ability to rein in all of O'Hara's public statements prior July 20, 2006, and the corresponding publications of those statements. We cannot unsay what has already been said in the public forum. *In re von Bulow*, 828 F.2d at 99. Put another way, "the genie is out of the bottle ... [and we] have not the means to put the genie back." *Gambale v. Deutsche Bank AG*, 377 F.3d 133, 144 (2d Cir.2004). However, we do have the ability to confine the extent and degree of O'Hara's further public pronouncements that may tread upon any attorney-client privilege that still subsists. Courts retain inherent supervisory authority over discovery and can extend a protective order to squelch any abuses. *See* FED. R. CIV. P. 26(c).

We are also persuaded because of the convoluted nature of these claims, facts and issue, and O'Hara's inextricable involvement in all of these contentions that an additional day of deposition should be granted.

O'Hara has no objection to a deposition by Plaintiffs and a separate deposition as related to the *Ross* litigation but complaints that he is being compelled to a third day of testimony. Dkt. No. 68, Defs.' Mem. of Law at p. 21. Under normal circumstances, O'Hara would be subjected to a one day, seven hour deposition. FED. R. CIV. P. 30(d)(2). However, O'Hara has placed himself into the thicket of things and invariably caused himself to be subjected to two separate depositions. But for his leak of the Interfor Report and the sting operation, he may have rested below the radar and may not have been served with a subpoena to be deposed in the New Jersey case. But he has acknowledged these leaks, and we have upheld Ross's subpoena. Also due to his extracurricular activities, he has placed himself into the unenviable position of having to endure two days of depositions in this case. He has become pivotal on a number of issues, which probably cannot be fully explored within the seven hours. Since this Court has the authority to allow additional time, and also finds that NXIVM has made a compelling application for that additional time, if needed, O'Hara shall submit to a two-day deposition in this case. *Id.*

Foreboding that there may be a number of contentious issues regarding O'Hara's depositions and recognizing the rising level of tension among all of the parties, the Court directs that O'Hara's depositions shall take place in the James T. Foley Courthouse, Attorney's Lounge on the Fourth Floor, Albany, New York, so that this Court will be in close proximity to respond immediately to any issue or difficulties that may arise. So that we may be prepared to respond to hyper-technical objections and the like, the parties are directed to put this Court on notice of the dates and times of O'Hara's depositions.

## IV. CONCLUSION

Most if not all of the pleadings, legal memoranda, and exhibits before this Court have been submitted *in camera* and are noted on the case docket as sealed. Moreover, this Memorandum Decision and Order has keenly discussed in acute detail what has been considered by one or more of the parties to be confidential information. Consistent with the mandates of *Lugosch v. Congel*, 435 F.3d 110 (2d Cir.2006), this Court intends on unsealing all of the pleadings, memoranda, exhibits, and transcripts as judicial documents. However, because the Memorandum–Decision and Order pertains to sensitive information, and it is unknown if any party intends on filing objections to this Decision, the Court will seal this Decision and Order for ten (10) days to permit the filing of any objections, if desired, with the District Court. If objections are filed the Court will maintain this Order under seal until those objections are fully considered by the District Court. In lieu of this Memorandum Decision and Order, this Court will issue a brief Order noting the granting and denying of Motions. Nonetheless, the parties will be served with a full copy of this Memorandum–Decision and Order so that they may contemplate the viability of an appeal.

In terms of the Intervenor Ross, he will receive a redacted version of this Memorandum Decision and Order excising a portion of the third-party waiver analysis. On that issue, confidential information was presented to the Court which was not shared with Ross.

Based upon all of the foregoing, it is hereby

**ORDERED**, that Plaintiffs' Omnibus Motion (Dkt. No. 57) is **granted in part and denied in part**, consistent with our Decision above. More specifically,

- Motion for a Protective Order is **granted in part and denied in part**;
- Motion to Compel further production of its files is **denied**;
- Motion to Compel O'Hara to produce his initiated communications with third parties is **granted**;
- Motion for an additional day of deposition of O'Hara, pursuant to FED. R. CIV. P. 30(d)(2), is **granted**;
- Motion to Quash Ross' Subpoena is **denied**; and it is further

146

ORDERED, that Ross' Opposition to Plaintiffs' Omnibus Motion (Dkt. No. 67) is **granted in part and denied in part**, consistent with our Decision above. More specifically,

- Motion to stay our Decision and defer to the adjudication of the issues by the District Court of New Jersey is **denied**;
- Application to waive any privileges as to the Interfor Report and sting operation is **granted**;
- Subpoena granting permission to depose O'Hara is **granted**; and it is further

ORDERED, that O'Hara's Opposition to Plaintiffs' Omnibus Motion (Dkt. Nos. 58 & 68) is **granted in part and denied in part.** More specifically,

- Application to waive any privileges as to certain documents is **granted**;
- Opposition to Motion to Compel is **denied**;
- Opposition to a second day of deposition is **denied**; and it is further

ORDERED, that Plaintiffs and Defendants shall be served with a copy of this sealed Memorandum–Decision and Order and are required to maintain the Order's confidentiality until either the time for appeals has exhausted or any appeal has been fully considered by the District Court. Intervenor Ross shall be served with a sealed, redacted copy of this Memorandum–Decision and Order under the same direction; and it is further

ORDERED, that this Memorandum–Decision and Order and all of the pleadings, memoranda of law, exhibits, transcripts and letters, related to this Omnibus Motion and Opposition thereto, shall remain or be filed under seal for ten (10) days. If objections are filed, all of these judicial documents shall remain sealed until the appeal to the District Court has been completed; and it is further

ORDERED, that in the interim pending any appeal of this Memorandum–Decision and Order, the Clerk of the Court shall file on the case docket an abridged Order, which recites only the rulings; and it is further

ORDERED, that any and all depositions of O'Hara shall occur at the James T. Foley Courthouse, Fourth Floor Attorney's Lounge, 445 Broadway, Albany, New York.

**IT IS SO ORDERED.**